[No. C000138. Third Dist. Feb. 13, 1987.]

PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff and Appellant, v. JOHN ZUCKERMAN et al., Defendants and Appellants.

**COUNSEL**

Howard V. Golub, Robert L. Bordon, Robert R. Rickett, David W. Anderson, Donald Erickson, Diehl, Steinheimer, Riggio, Haydel & Mordaunt and Donald M. Riggio for Plaintiff and Appellant.

John M. Reece, Werdel, Chapin & Leverett, Sidney P. Chapin, Rader, Rader, Goulart & Mackay, Richard E. Rader, Lascher & Lascher, Edward Lascher and Wendy C. Lascher for Defendants and Appellants.

**OPINION**

**SPARKS, J.**—In this appeal we are called upon to determine a variation on the theme of the "rule of capture" as it applies to recovered gas. Plaintiff

Pacific Gas and Electric Company (PGandE) acquired storage rights to an exhausted gas reservoir on an island in the San Joaquin delta. It also entered into an oil and gas agreement with the owners of the island to operate a nearby well on a parcel adjacent to the reservoir and to pay royalties for gas extracted from the well. PGandE then purchased gas from suppliers in Texas and Canada and injected it into the reservoir for use in periods of high demand. Meantime, it operated the nearby well. As fate would have it, the injected gas migrated to the adjacent parcel and PGandE found itself paying royalties on its own gas. This inevitable lawsuit eventually followed. The trial court entered a judgment requiring PGandE to pay over $6.5 million in royalties on its own gas. One of the questions on appeal is whether the owner loses its ownership of recovered gas when it injects that gas into a natural reservoir and the gas migrates. We hold that once gas has been reduced to personal possession, the owner is not thereafter divested of ownership simply because it stores the gas underground and that gas migrates. Consequently, the stored gas was not subject to capture by others and PGandE was not required to pay royalties on its own gas. In addition to this question, we also consider the valuation of storage and mineral rights and the application of the parol evidence rule to an oil and gas agreement.

This litigation commenced when PGandE filed an action in eminent domain to acquire the right to inject, store and withdraw gas from beneath 472 acres on the adjacent parcel belonging to the defendants. Additionally PGandE sought to quiet title to gas which had migrated under defendants' land after its injection into the underground storage facility. PGandE also sought a refund of excess royalty payments it had made to defendants. Defendants cross-complained for what they termed declaratory relief, inverse condemnation, trespass, nuisance, breach of lease, and estoppel. After a court trial, judgment was entered granting PGandE's request for condemnation of the property interest it sought, and awarding defendants damages in the amount of $13,793,155, together with prejudgment interest. The court entered a subsequent order granting litigation expenses to defendants in the sum of $169,011.69, but denying their request for attorneys' fees. PGandE appeals from the judgment awarding defendants nearly $14 million and defendants appeal from the denial of attorneys' fees. Additionally, defendants have filed a motion for sanctions against PGandE for prosecuting a frivolous appeal. For reasons we shall explain, we have concluded that the judgment must be reversed. Needless to say, the request for sanctions must be denied as well.

### FACTS AND PROCEDURAL HISTORY

Recently in *Lynch* v. *State Bd. of Equalization* (1985) 164 Cal.App.3d 94 [210 Cal.Rptr. 335], we were confronted with questions concerning the valuation of oil and gas producing properties for property tax purposes. In this

case we are again confronted with questions concerning valuation, but here the date of valuation arises at a time after the life of the oil and gas producing property has expired. As we noted in *Lynch,* oil and gas exists in the interstices of rock occupying certain strata. (*Id.,* at p. 99.) When these deposits are located, the oil and gas can be extracted, initially by the use of the reserve's natural pressure (called reservoir energy) and later through secondary methods of extraction. (*Id.,* at pp. 99, 101.) Although not all the oil and gas can be extracted from a deposit, eventually a field will be depleted to the extent that it is no longer useful as a producing property. (*Ibid.*) When this occurs some gas fields, due to their geological and geographical characteristics and their large capacity, can be economically used for storage purposes. In this process the user of the field (typically, but not invariably a public utility) purchases gas from other sources during periods of low demand, and injects it into the now depleted reservoir. During periods of high demand this foreign gas can be withdrawn from the reservoir and sold to customers. This case concerns such a property, known as the McDonald Island gas field.

The McDonald Island gas field was originally discovered in June 1936 by the Standard Oil Company of California. The reservoir, called the McDonald sands, lies approximately 5,200 to 5,300 feet below sea level.[1] Standard operated the property as a gas producing property until 1958. Beginning in 1947, as the McDonald Island field was nearing the end of its productive life, Standard acquired the right to store gas in the lands in which it had previously only held oil and gas leases. In 1958 PGandE and Standard agreed to an exchange of properties. It appears that PGandE then held an oil and gas interest in a producing gas field in Rio Vista which it used to trade for the McDonald Island interests of Standard. The parties placed a value on the trade of $7,391,597, which was approved by the Public Utilities Commission. PGandE sought and obtained approval of the Public Utilities Commission to use the McDonald Island property as a storage project.

Defendants are the landowners of McDonald Island. They have acted through John Zuckerman, who was appointed as agent for all the landowners. By 1962 Zuckerman had come to the conclusion that the existing agreements were inequitable and so he sought to renegotiate them. Among other things, he objected that the agreements did not require exploratory drilling on land not occupied by the storage reservoir.[2] He stated that if the agreements were not changed then "we were going to court and ask that they be changed on

---

[1] In describing oil and gas reservoirs geologists utilize subsea levels without regard to depth below the actual surface.

[2] As noted the McDonald sands lie at a depth of approximately 5,200 feet below sea level. The agreements by which Standard acquired storage rights gave Standard rights to a depth of 6,835 feet subsea. Defendants retained mineral interests in zones deeper than that, and in the property outside of the storage reservoir. The Standard Oil agreements, however, did not require that exploration be conducted for other oil and gas deposits.

the basis of inequity." The parties renegotiated and in 1963 a new agreement was executed. It is that agreement which is in dispute here.

In the 1963 agreement McDonald Island was divided into three parcels, which may be illustrated with the following diagram:

In the diagram, the cross-hatched area in the center of parcel I represents the area the parties then believed to be occupied by the storage reservoir. Parcel I included the storage reservoir and in that parcel PGandE owned storage rights and all the mineral rights. In parcel II PGandE retained the storage rights and the gas rights and defendants retained the oil rights. For this purpose, "oil" was defined as hydrocarbons recovered in paying quantities as a liquid and which remained as a liquid under atmospheric pressure and temperature, and "gas" included all other hydrocarbons but did not include asphaltum. Under the agreement PGandE leased the oil rights from defendants in parcel II, but was not required to explore for oil while it operated the storage reservoir. Parcel III included the property to the west of parcel I, and additionally included the mineral rights below parcels I and II at a depth greater than 6,835 subsea.[3] Defendants retained the mineral

---

[3]In fact, parcel III is somewhat larger geographically than the triangular parcel depicted on the diagram. Nevertheless, the triangular parcel labeled parcel III on the diagram is the parcel which is at issue in this proceeding. For purposes of this appeal then it is sufficient to refer to this parcel as parcel III.

rights in parcel III and PGandE leased those rights pursuant to a traditional oil and gas lease. PGandE was required by this agreement to explore for oil and gas in parcel III and, upon discovery of oil or gas, to produce that oil or gas so long as it could be produced in paying quantities. In the event PGandE failed in its obligations under the lease with respect to parcel III, then the leased rights would terminate and revert back to defendants.

Acting under the terms of the agreement PGandE explored parcel III for hydrocarbons by drilling a well known as Zuckerman-Henning No. 1. Initial exploratory efforts were negative, but on redrilling gas bearing sands were discovered.[4] These gas bearing sands were located at a depth that was approximately equal to the depth of the storage reservoir. This indicated that perhaps PGandE had struck the storage reservoir. Although initially the gas extracted through the Zuckerman-Henning No. 1 well was native gas (that is, gas that had been there originally), it ultimately became clear that the deposit in parcel III was connected to the storage reservoir. Two primary factors established this fact. First, the pressure initially encountered in the well was less than should have been expected in a separate reservoir, and rather than decrease with production it varied with the pressure variance in the storage reservoir.[5] The second factor which indicated that the storage reservoir was connected to the Zuckerman-Henning deposit was the gradual rise in the BTU (British Thermal Unit) quality of the gas recovered. The heating value of gas is measured in BTUs per cubic foot. The gas originally in the McDonald Island deposit, and the gas originally extracted from Zuckerman-Henning No. 1, had a BTU content of 962 per cubic foot. The gas which PGandE was purchasing from sources outside California and injecting into the storage reservoir had a much higher BTU content. As the Zuckerman-Henning well was operated over time the BTU content of the recovered gas gradually rose, which indicated that the native gas was mixing with injected gas.

---

[4]In exploring for oil and gas the same initial bore can be used for multiple explorations. Typically the first drill will be straight down, and where that is negative the driller can come partially back up the hole, close it with cement, and drill on an angle to another direction. With the Zuckerman-Henning No. 1 well it took a third redrill before gas was discovered in paying quantities.

[5]In the early stages of oil and gas production the reservoir's natural pressure is used and as depletion reduces natural pressure secondary methods of extraction, including gas and water injection to increase pressure, may be used. (*Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at p. 101.) These methods are generally used only with respect to the production of oil; few, if any, secondary production methods are used for the recovery of gas. (*Id.,* at p. 101, fn. 1.) Of course, it makes no economic sense to inject gas into a reservoir simply to enhance the recovery of other gas. Nevertheless, in the peculiar circumstances of this case it appears that PGandE's gas injection into the storage reservoir had the effect of enhancing pressure in the Zuckerman-Henning portion of the reservoir and thus PGandE was unintentionally engaged in secondary methods of gas recovery from the commencement of production.

The situation after the discovery of gas in the Zuckerman-Henning well can be illustrated by the following diagram:

Comparison of this diagram with the 1963 diagram, reveals two changes. First, the cross-hatched area which represents the storage reservoir has changed and it now appears that the storage reservoir in fact intrudes into the ground underlying parcel III. Second, the storage rights controlled by PGandE have been increased by the addition of a portion of land in the southwest of parcel I. This addition occurred after the property owners in that portion of land drilled a well that hit the storage reservoir and PGandE was forced to purchase the storage rights to that tract, referred to as the Lower Jones tract.

When the Zuckerman-Henning well struck a portion of the storage reservoir PGandE was placed between the proverbial rock and a hard place. It had "dug up a snake," to use the terminology of one of PGandE's employees. PGandE had invested a large sum (estimated in excess of $25 million) in the storage project. Although the gas initially extracted from the Zuckerman-Henning well was native gas, it was apparent that due to the fugacious nature of gas the injected gas would migrate to the Zuckerman-Henning well as the native gas was produced. (See *Lynch* v. *State Bd. of Equalization,* *supra,* 164 Cal.App.3d at p. 100.) Under its lease obligations with respect to parcel III PGandE had a duty to operate the well and to pay royalties to defendants so long as the well could produce paying quantities, and if PGandE ceased operating the well the right to operate it would revert to defendants.

PGandE was unsure of its legal position but in order to avoid a question of default it determined to operate the well and pay a royalty to defendants. Defendants were notified of the facts and diplomatically advised that "In due course, when the results of further drilling have been evaluated, we anticipate discussing with you the ultimate resolution of the problems resulting from this exploration." PGandE operated the well and paid royalties to defendants from 1967 until 1980. At some point it became clear that a greater volume of gas had been produced from the well than had originally been in place. Eventually it also became clear that all of the original gas had been produced with the result that the well was then yielding only injected gas. In 1980 PGandE notified defendants that it would cease paying royalties on injected gas and would seek to condemn additional storage rights by eminent domain. The decision led to the filing of this suit.

The matter was tried to the court. The parties agreed that this is an appropriate case for eminent domain and the only questions at trial were the elements and amount of damages to be paid. The trial court awarded three types of damages. It found the value of the storage rights to be $6.93 million and awarded defendants this amount with the legal rate of interest from August 1, 1980. The court found that PGandE was also required to compensate defendants for their mineral interest in the subject property and the court found that this interest included the right to insist that PGandE operate the Zuckerman-Henning well without regard to whether gas extracted through that well was native or injected and to receive a royalty on gas extracted through the well for so long as the well could produce gas in paying quantities. This essentially meant for as long as PGandE operated its storage reservoir. The value of this interest was found to be $6,505,155 and this amount was awarded with interest from February 22, 1982. The court further found severance damages to be $358,000 and it awarded this amount with interest from the date of judgment. The judgment included additional findings that by ceasing to operate the Zuckerman-Henning well PGandE breached the 1963 lease agreement, and awarded damages for breach of contract in the amount of $6,505,155 as an alternative to damages for condemnation of the defendants' mineral interests. The court further found that PGandE abandoned the gas underlying parcel III as of August 1, 1980, and awarded defendants the sum of $2,938,000, but held that sum to be subsumed within the damages awarded for condemnation of the mineral rights. By subsequent order the court awarded defendants litigation costs of $169,011.69, but denied their request for attorneys' fees.

## DISCUSSION

When private property is taken through eminent domain, the condemning agency must pay "just compensation" to the owner. (U.S. Const., 5th

Amend.; Cal. Const., art. I, § 19.) The measure of just compensation is the fair market value of the property taken. (Code Civ. Proc., § 1263.310.) In normal circumstances the "fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (Code Civ. Proc., § 1263.320, subd. (a).) But where there is no relevant market for the property then the fair market value is to be determined by any method of valuation that is just and equitable. (Code Civ. Proc., § 1263.320, subd. (b); Evid. Code, § 823.)

█ In condemnation cases it is a firmly established principle that the compensation payable is to be based upon the loss to the owner rather than upon the benefit received by the taker. (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 866 [135 Cal.Rptr. 647, 558 P.2d 545].) The California Supreme Court early stated that "it seems monstrous to say that the benefit arising from the proposed improvement is to be taken into consideration as an element of the value of the land." (*San Diego Land etc. Co.* v. *Neale* (1888) 78 Cal. 63, 75 [20 P. 372].) This has been construed to mean that "[t]he beneficial purpose to be derived by the condemnor's use of the property is not to be taken into consideration in determining market values, for it is wholly irrelevant." (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 754 [264 P.2d 15], overruled on another ground in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680], and quoted with approval in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 491 [93 Cal.Rptr. 833, 483 P.2d 1].) This rule, however, does not mean that evidence of the highest and best use of the property must be excluded simply because that is the use that the condemner intends to make of the property. In *Neale*, the court held that it was not proper to take into consideration the ongoing construction of a dam in valuing the property and that it was improper to consider the enhanced value the condemner would obtain in other property after completion of the dam. (78 Cal. at pp. 74-75.) But the court went on to hold that it was proper to consider the value of the land " 'as a reservoir site.' " (*Id.,* at p. 71.) Similarly in *City of Los Angeles* v. *Decker, supra,* 18 Cal.3d at page 869, the court reiterated that it is improper to award compensation based upon the value to the condemner, but held that it was proper in that case to consider the value of the property for parking purposes (the highest and best use) despite the fact that the city intended to use it for such purposes. Finally, the rule does not mean that a condemner can appropriate property for nothing simply because in one sense it might be said that the property has no market value in the hands of the owner. (*San Diego Land etc. Co.* v. *Neale, supra,* 78 Cal. at p. 68. See also Code Civ. Proc., § 1263.320,

subd. (b).) With these principles in mind we turn to a consideration of the elements of damage awarded defendants.

I

STORAGE RIGHTS

 The trial court awarded defendants the sum of $6.93 million for the condemnation of the storage rights in parcel III. In doing so the court accepted without qualification the valuation of defendants' expert witness, Robert Paschall. PGandE contends that reasoning employed by Paschall was so irrational and unsupportable that his opinion on value does not constitute substantial evidence. Defendants retort that Paschall's testimony provides formidable support for the trial court's findings of value. Because we find Paschall's evaluation to be riddled with error and to be a clearly overinflated estimate of the value of the storage rights, we agree with PGandE that the award cannot stand.

Pascall's evaluation can be best described as a modified comparable sales approach. In the ordinary case, a sale of other property, to be considered comparable, "must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued." (Evid. Code, § 816; see also *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 415 [82 Cal.Rptr. 1].) But this was not an ordinary case. It may fairly be said that there are no true "comparables" in dealing with underground storage reservoirs. There are relatively few such properties in the state, and those noted by the experts involved different geographical locations, temporal transactions, and physical characteristics. In normal circumstances this would preclude the use of a comparable sales approach. But it is clear that underground storage properties are sui generis and that normal approaches to valuation are problematical. For this reason latitude must be accorded an expert in valuing such properties, and any approach that is "just and equitable" may be considered. (Evid. Code, § 823; Code Civ. Proc., § 1263.320, subd. (b).)

For all that, there are limitations and those limits were exceeded here. Where an expert attempts to value property by considering sales of other property which are not truly comparable, then it is necessary, in evaluating the validity of the expert's opinion, to consider the effect the differences between the properties may have on value. When those differences are exam-

ined in this case, the variations are so material that, when coupled with other faulty assumptions, they undermine the validity of the expert's opinion to such an extent that his opinion cannot be deemed to constitute substantial evidence of value.

Paschall began by rejecting the transactions involving other storage facilities and elected instead to base his estimate of value upon the 1958 transaction in which PGandE acquired the McDonald Island rights from Standard Oil.[6] As reported to the Public Utilities Commission (P.U.C.), the total value of the transaction to PGandE was $7,391,597. This value was arrived at through negotiations of the parties by using a capitalization of income

---

[6]Paschall's refusal to consider other transactions in determining his estimate of value for the parcel III rights is explicable only in terms of his unflagging desire to unduly puff the damages to be awarded defendants. As a matter of law the closer a property is in terms of physical characteristics and time of sale the more comparable it is to the subject transaction. Even though underground storage areas tend to be sui generis, the most nearly comparable sale to the entire McDonald Island tract was the 1979 transaction involving property known as Ten Section. The Ten Section transaction involved 2,471 acres compared to McDonald Island's 2,080 acres. It has a working capacity of 50 billion cubic feet compared to McDonald Island's 54 billion cubic feet. And the transaction occurred in 1979, less than 3 years before the date of valuation here, and more than 21 years closer in time than the original McDonald Island transaction. The 1979 acquisition cost of all of the Ten Section rights was $34,145,000. The parties designated the value of the storage rights as $6,092,000. Even utilizing Paschall's method of including other nonstorage property rights in the storage rights for valuation purposes, an approach we reject, Paschall was still only able to claim a 1979 storage right value of $15,357,000 for the Ten Section parcel, which was indexed to 1982 at $19,964,000. This may be contrasted with the 1982 value of the McDonald Island storage rights claimed by Paschall to be $64,355,000. Even using Paschall's approach, which we find to be erroneous in many ways, a comparison of McDonald Island with Ten Section would produce a value of the parcel III rights far less than one-third of the value he claims those rights have. Another obvious comparable transaction ignored by Paschall was the 1968 acquisition by PGandE of the Lower Jones tract. As noted in the diagram, the storage reservoir at McDonald Island not only intruded into parcel III, it also intruded into land to the south of parcel III owned by other parties. When this was discovered PGandE was forced to negotiate the purchase of rights in the Lower Jones tract. This involved 462 acres, compared to the total of 472 acres involved here. It also involved the purchase of rights which represent a small portion of a much larger storage reservoir. In 1968 PGandE paid $211,000 for all of the rights in the Lower Jones tract, and the parties designated $42,000 as the price of the storage rights. That transaction would indicate a value of the parcel III storage rights which would be but a fraction of those claimed by Paschall. A third comparable transaction is the state's lease rights in McDonald Island. As explained below, the state owns approximately 8.827 percent of the land over the storage reservoir on McDonald Island and PGandE leases the state's portion of the reservoir. Paschall used a capitalization of income (rent) approach to value the state's interest and determined its value to be $1,165,428. Even using an acreage approach, which we find erroneous, Paschall determined this would indicate a value of $1,421,822 for the parcel III rights. Paschall refused to consider the other storage rights transactions because there were few of them and they indicated a wide range of values. He dismissed the comparison with the state's McDonald Island interest by saying "I considered the State had a bad bargain of it." Paschall's refusal to consider these clearly comparable transactions in favor of considering a transaction 24 years prior to the valuation date casts severe doubt upon the validity of his approach. Despite these defects, we reject his evaluation of even more serious errors.

approach to value the Rio Vista producing properties given in exchange for the McDonald Island properties, with a retention of a royalty interest in the Rio Vista properties by PGandE's wholly owned subsidiary, Natural Gas Company. In its P.U.C. application for approval of the transaction and to operate the storage facility PGandE reported a value of $1,639,681 for the storage rights acquired at McDonald Island.

Paschall eschewed the P.U.C. approved figure and derived his own estimate of the value of the McDonald Island storage rights, purportedly from the P.U.C. report. His approach was to deduct from the total P.U.C. value of transaction rights the sums he considered to be attributed to nonsubsurface rights. He used a value of $2,811,000 for the nonsubsurface rights.[7] A review of the P.U.C. report and Paschall's testimony reveals that his approach was to deduct from the total value of the transaction the assigned value of all interests except leaseholds, storage rights, gas in the underground reservoir, and the value of interests retained by Natural Gas Company.

Paschall's approach was clearly erroneous. Property cannot be considered comparable where it includes various fixtures, rights, improvements, and personal property which the property being condemned does not include. For example, in *City of Santa Cruz* v. *Wood* (1967) 252 Cal.App.2d 52, at page 56 [60 Cal.Rptr. 26], the city sought to acquire property for sewerage purposes. The defendant owner sought to introduce into evidence an estimate of the acquisition cost by the city's director of public works. The estimate, however, included many miles of rights of way in other property besides a part of the land at issue. The court held that the exclusion of the evidence was proper since it had no logical tendency to prove the value of the land in question and could only have served to confuse the court and jury. Similarly, in *Los Angeles etc. School Dist.* v. *Swensen* (1964) 226 Cal.App.2d 574, at page 583 [38 Cal.Rptr. 214], the trial court excluded evidence of the unit sale of three parcels of property in the same tract as the subject property. The Court of Appeal upheld the exclusion, noting that the three lots had a much greater frontage area, far more living space, fronted on a principal business street, and the price included an indeterminate amount for furniture and art objects which were included in the sale. (See also *City of Rosemead* v. *Anderson* (1969) 270 Cal.App.2d 260, 266-267 [75 Cal.Rptr. 575].)

In valuing the storage rights in parcel III the only property interest at issue was the naked right to store gas deep within the earth under defendants' land.

---

[7]In his report Paschall stated that the value of $2,811,000 represented the value of the nonsubsurface rights and properties at Rio Vista. Obviously the value of nonsubsurface rights at Rio Vista has nothing whatsoever to do with the value of the nonstorage rights at McDonald Island, but it appears that the statement in the report was simply an error in explanation.

PGandE acquired no surface rights in parcel III, and interference with surface uses was compensable as severance damages. Any mineral interests defendants may have, including the right to gas in the portion of the storage reservoir under parcel III, were treated by the court and the parties as a separate item of damages. In the 1958 transaction PGandE acquired from Standard Oil a number of surface and nonsurface rights and leaseholds, including oil and gas leases on all of McDonald Island. To fail to exclude these leasehold interests in considering the value of the storage rights was improper. It was likewise improper to include consideration of the value of the interests retained by Natural Gas Company since those interests inured to the benefit of PGandE and reduced rather than increased the costs of the McDonald Island rights. The major error, however, was to include the value of the gas in the storage reservoir acquired by PGandE in the 1958 transaction.[8] As we have noted, any right defendants had to the gas in the storage reservoir was to be compensated, if at all, as a separate item of damages. In determining the value of the storage rights it was therefore erroneous to attempt to compare the property to a storage reservoir with existing gas supplies. The value of the gas in storage in 1958 was $2,739,014, an amount well in excess of one-half of the total value Paschall arrived at for the 1958 storage rights. Through this approach Paschall was able to ignore the P.U.C. approved value of $1,639,681 for the storage rights, and to assign a value of $4,581,000 to those rights in 1958.

Since PGandE did not acquire all of the rights to the storage reservoir in 1958 it was necessary to adjust the value of the rights it obtained to reflect the value of the whole field. Paschall made two adjustments to the $4,581,000 figure. One was reasonable and is easily explained. It appears that Whiskey Slough meanders across parcels I and II and crosses directly over the storage reservoir. The State of California owns the land underlying Whiskey Slough and the portion of the storage reservoir in state lands was not acquired by PGandE from Standard Oil. PGandE is required to lease that portion of the reservoir from the state. Paschall concluded that the state's portion of the reservoir is 8.827 percent, and thus PGandE acquired only 91.173 percent of the reservoir from Standard. In order to determine the value of the whole reservoir it was necessary to divide the price paid by PGandE by the 91.173 percent interest it acquired. Paschall used a similar

---

[8]It was established that in the operation of an underground storage reservoir the entire volume of the reservoir cannot be utilized for working purposes. A "cushion" volume of gas is required which will remain in the reservoir at all times and which will be recovered only upon termination of the use of the reservoir for storage purposes. When a storage facility is acquired the buyer will be required to inject gas into the reservoir to reach the cushion level before it can be used for storage, and if there is a volume of gas in the reservoir in excess of the cushion then the buyer acquires usable gas in the transaction. In either event, the buyer is required to pay for the gas which is then in the storage reservoir; it cannot simply purchase the rights without the gas.

method to adjust defendants' royalty rights in McDonald Island. But the royalty rights in McDonald Island related to any potential minerals outside of the storage reservoir; there were no outstanding royalty rights in the storage reservoir. This latter adjustment to the 1958 purchase price of the storage rights was unsupported.

It is necessary, as all the experts agreed, to translate the prices paid in earlier comparable sales into 1982 dollars, that being the date of valuation in this case. The gross national product rate of inflation between 1958 and 1982 was 309 percent, which produces a multiplier of 3.09, and which was utilized by most of the experts in considering the earlier McDonald Island transaction. Paschall testified that the State Board of Equalization maintains inflation factors for petroleum exploration and production properties, and that the board's factor for 1958 to 1982 was 3.29. Paschall rejected both the gross national product and the State Board of Equalization factors and created his own by comparing the wellhead price of gas from 1958 to 1982. In 1958 the wellhead price of gas was 29 cents per cubic foot, while in 1982 it was $3.25 per cubic foot. This was an inflation rate of 1,121 percent, which produced a multiplier of 11.21. This was the multiplier Paschall chose to use. His approach was flawed for numerous reasons. Paschall testified that since the parties used a capitalization of income method in valuing the Rio Vista properties in 1958 they ought to be willing to do so again. However, a capitalization of income approach considers the net income stream to be derived from a producing property. The wellhead price of gas is a gross price and changes in the wellhead price do not necessarily reflect changes in the net income to be derived from the property. Moreover, in determining the value of the Rio Vista properties in 1958 the parties estimated future increases in the price of gas and thus to an extent already took into consideration the inflation factors used by Paschall. Further, the capitalization of income approach was used to value the Rio Vista properties and not the McDonald Island properties. Rio Vista was a producing gas field. While increases in the price of gas might cause an increase in the value of a producing field, it is wholly speculative whether increases in the gross price of gas would result in a proportionate increase in the value of storage rights. In any event, nothing in the record would support such a conclusion.

In our view the decision in *East Bay Mun. Utility Dist.* v. *Kieffer* (1929) 99 Cal.App. 240, at page 250 [278 P. 476], aptly sets forth the controlling principle. There the utility district sought to acquire property for water reservoir purposes and the defendant unsuccessfully sought to introduce evidence of the selling price of water and electricity as evidence of value. Affirming the rejection of that evidence, the court said: "But the relation between the value of land in a proposed reservoir and the current price of water and electric energy is too remote and conjectural to be of any reliable assistance to

the jury in determining the market value of the land taken." Likewise in *People* v. *Dunn* (1956) 46 Cal.2d 639, at page 641 [297 P.2d 964], it is said: "It is settled that evidence of profits derived from a business conducted on the land is too speculative, uncertain and remote to be considered as a basis for ascertaining market value."

Finally, Paschall's assumption that an increase in value in a storage property may be determined by direct comparison with a producing property also fails. In *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, at pages 885-887 [191 Cal.Rptr. 392], the trial court valued a closely held corporation by relying solely on the testimony of an expert who evaluated the business by comparing it with the selling price/book value ratio of publicly traded corporations. Due to the dissimilarities between the two types of businesses the comparison failed and the expert's testimony was held not to constitute substantial evidence to support the judgment. Similarly, a storage facility is obviously too dissimilar to a producing property to permit direct comparison in the manner utilized by Paschall.

After going through these flawed steps Paschall derived a 1982 value for the entire storage reservoir of $64,348,000. It was then necessary to determine the portion of this value which was attributable to the portion of the reservoir under parcel III. In order to do this Paschall used surface acreage. It was estimated that the reservoir occupies 2,080 acres. Paschall concluded that the parcel III portion of the reservoir was 10.77 percent of the entire reservoir, and thus that the value of the parcel III portion was $6,929,636, rounded to $6.93 million. Once again Paschall erred. It was established, and Paschall conceded, that the reservoir is thickest in the middle and the fringes of the reservoir contain far less storage capacity than the middle areas. It was variously estimated that the portion of the reservoir in parcel III contains from 2.55 percent to 4 percent of the total reservoir capacity. PGandE acquired no surface rights and in valuing the storage rights the surface area is irrelevant. To belabor the obvious, the storage rights have value only for storage purposes, and the sole factor that gives them value is storage capacity. Clearly, the portion of the reservoir's value which is attributable to the parcel III property must be based upon volume rather than surface area.

The final value which Paschall assigned to the storage rights was totally disproportionate to any other estimate of value given, including Paschall's own estimates using different methods of valuation. The disproportionate nature of that valuation can be shown by reference to McDonald Island transaction. Everyone agreed that in 1958 PGandE paid $7,391,597 for the McDonald Island rights. Included in the transaction were numerous surface rights, rights of way, leasehold interests, equipment and facilities, and oil and gas leases on all of McDonald Island with the provision that exploration

was not required for so long as the storage reservoir was utilized. No such additional rights are at issue in valuing the storage rights in this case. However, even if we make no adjustment for those interests, the portion of the 1958 transaction which could be attributed to a 2.55 percent portion of the properties would be $188,485.72, and the portion attributable to 4 percent portion would be $295,663.88. The gross national product rate of inflation from 1958 to 1982 was 309 percent, which produced a multiplier of 3.09. The judgment here results in a rate of inflation of 3,677 percent (multiplier of 36.77) for a 2.55 percent portion of the transaction, and 2,344 percent (multiplier of 23.44) for a 4 percent portion of the transaction.

■ In an action in eminent domain the value of the property condemned is a factual question and the trier of fact's valuation findings will be upheld when they are supported by substantial evidence. (*Los Angeles etc. School Dist.* v. *Swensen, supra,* 226 Cal.App.2d at p. 581.) But this does not mean that any determination of value, no matter how excessive and absurd, will constitute substantial evidence simply because some expert is willing to state it as his opinion. To be considered substantial, evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 438, 16 A.L.R.4th 1255], quoting *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) ■ Courts, both trial and appellate, have the responsibility of insuring that an expert's determination of value takes into account only reasonable and credible factors. As this court said in *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed* (1963) 215 Cal.App.2d 60, at page 69 [29 Cal.Rptr. 847]: "A condemnation trial is a sober inquiry into values, designed to strike a balance between the economic interests of the public and those of the landowner. [Citation.] There is a limit to imaginative claims even when described in terms of a prospective buyer's mental reactions. To say that only the witness' valuation opinion has probative value, that his 'reasons' have none, ignores reality. His reasons may influence the verdict more than his figures. To say that all objections to his reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts. [Citations.]"

The opinion of an expert must be on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) As Witkin notes, "[w]hat are reliable matters depends on the particular subject, and no statutory listing is possible. The Evidence Code prescribes minimum requisites for all cases, leaving particular rules to be formulated, as in the past, by judicial decisions." (Witkin, Cal. Evidence (2d ed. 1966) The Opinion

Rule, § 409, pp. 367-368.) This requirement of reliability has been carried over into the statutes containing "special rules of evidence applicable to any action in which the value of property is to be ascertained." (Evid. Code, § 810, subd. (a).) Thus Evidence Code section 814 provides that "[t]he opinion of a witness as to the value of property is limited to such an opinion as is based on the matter perceived by or personally known to the witness or made known to the witness at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property, including but not limited to the matters listed in Sections 815 to 821, inclusive, unless a witness is precluded by law from using such matter as a basis for an opinion." A special statute deals with the unusual occurrence when there is no relevant market. Evidence Code section 823 provides: "Notwithstanding any other provision of this article, the value of property for which there is no relevant market may be determined by any method of valuation that is just and equitable." This section parallels Code of Civil Procedure section 1263.320, subdivision (b), which provides that "[t]he fair market value of property taken for which there is no relevant market is its value on the date of valuation as determined by any method of valuation that is just and equitable." As the comment to this section notes, "subdivision (b) has been added to the definition because there may be no relevant market for some types of special purpose properties such as schools, churches, cemeteries, parks, utilities, and similar properties. All properties, special as well as general, are valued subject to the limits of Article 2 (commencing with Section 810) of the Chapter 1 of Division 7 of the Evidence Code. The Evidence Code provides that, regardless of whether there is a relevant market for property, its fair market value may be determined by reference to matters of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property including where appropriate, but not limited to, (1) the market data (or comparable sales) approach, (2) the income (or capitalization) method, and (3) the cost analysis (or reproduction less depreciation) formula." (Legis. Com. com., West's Ann. Code Civ. Proc. (1982 ed.) § 1263.320, p. 39.)

 The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed. (*People* v. *Coogler* (1969) 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777].) Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 338-339 [145 Cal.Rptr. 47]; *Richard* v. *Scott* (1978) 79 Cal.App.3d 57, 63 [144 Cal.Rptr. 672].) In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. (*Hyatt* v. *Sierra*

*Boat Co., supra.*) When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence. (*In re Marriage of Hewitson, supra,* 142 Cal.App.3d at pp. 885-887; *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 149-151 [181 Cal.Rptr. 572]. See also Evid. Code, § 801.) For example, in *In re Marriage of Hewitson, supra,* the expert attempted to determine the value of a closely held corporation by using the selling price/book value ratio of publicly traded corporations. Due to the differences in the two types of companies the analogy was improper and the judgment based upon the expert's testimony was not supported by substantial evidence. (142 Cal.App.3d at p. 887; see also *In re Marriage of Lotz* (1981) 120 Cal.App.3d 379, 384 [174 Cal.Rptr. 618].) Likewise, in *In re Marriage of Rives, supra,* 130 Cal.App.3d at pages 149-151, this court reversed a determination of the value of a queen bee business because the court accepted the testimony of an expert who had relied upon false assumptions and improper factors, and who had failed to consider all of the relevant factors which established value.

 We find this to be a case in which an appellate court cannot defer to the trial court's traditional role in drawing inferences and resolving conflicts in the evidence. In his evaluation Paschall gave no consideration to more comparable transactions and relied instead on an adjustment of a temporally remote transaction. In adjusting the remote transaction to reflect modern values he rejected the P.U.C. approved valuation of the storage rights and included in his consideration several items of property rights which are not included in the parcel III condemnation. He made an adjustment for nonexistent royalty rights in the storage reservoir. In adjusting 1958 values to 1982 values he disregarded the gross national product and State Board of Equalization inflationary factors and created his own factor based upon changes in the gross price of gas, an approach which is wholly speculative, remote, and conjectural. And in determining the portion of the reservoir's value attributable to parcel III Paschall rejected the sole factor which gives the storage rights value (volume) in favor of using the wholly irrelevant factor of acreage. The end result was a valuation of the parcel III storage rights which is excessive on its face and disproportionate to any other evaluation of the rights. The trial court accepted Paschall's conclusion without any critical assessment of the reasoning employed and the assumptions relied upon. Because we find insufficient evidence to support the judgment, it must be reversed and remanded for a new trial on the damages PGandE must pay for the storage rights underlying parcel III. For the benefit of the parties on remand it is necessary to note that defendants are not to be deprived of their property without just compensation simply because it has little or no value to them or to anyone other than PGandE. On the other hand, PGandE

cannot lawfully be forced to pay a disproportionate and inflated price for the storage rights simply because it finds itself between a rock and a hard place and has become a forced purchaser of those rights. Any reasoned approach which reaches a just and equitable result may be considered. (Code Civ. Proc., § 1263.320, subd. (b).) But whatever the approach, the emphasis must be on "just and equitable."

## II

### MINERAL INTERESTS

The trial court awarded defendants the sum of $6,505,155 for their mineral interests in the portion of parcel III which was condemned. As an alternative the court awarded the same amount for breach of the 1963 agreement. This award was premised on the court's conclusion that defendants had the right to insist that PGandE extract and pay royalties upon gas from the Zuckerman-Henning well for so long as gas could be extracted without regard to whether it was injected or native gas. The court reached this conclusion under the 1963 agreement, and did not consider whether California's oil and gas law supported such a result. We conclude that neither the agreement nor the law supports the award for mineral interests.

The basic aspect of our oil and gas law which must be considered here is the so-called "rule of capture." The rule has been stated this way: " 'The owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though it may be proved that part of such oil or gas migrated from adjoining lands.' " (1 Williams & Meyers, Oil and Gas Law (1983) § 204.4, p. 55, quoting from Hardwick, *The Rule of Capture and Its Implications as Applied to Oil and Gas* (1935) 13 Tex.L.Rev. 391, 403.) The principle may be easily explained. ■ Essentially, the law provides that oil and gas become the personal property of whoever brings it to the surface and reduces it to possession. (See *Lynch* v. *State Bd. Of Equalization, supra,* 164 Cal.App.3d at p. 102.) The right to drill for oil and gas is dependent upon ownership of the surface of the land. (*Ibid.*) The surface owner, or those claiming under him, who brings the oil or gas to the surface obtains a personal property interest in the oil or gas despite the fact that his activities may have caused the oil or gas to migrate to his land from the land of another. (*Ibid.*) Although this is the basic American law of oil and gas, different jurisdictions reach this result in different ways. In some jurisdictions, and under early California law, it has been held that the surface owner of the land has absolute title to the oil and gas underlying his land, but that title is defeasible if the oil or gas should migrate to the land of another. (164 Cal.App.3d at p. 102.) In other jurisdictions, and at one time in California, it has been held that ownership of oil and gas is inchoate and subject to "potential

possession." (*Ibid.*) Now it is firmly established in California that no one owns oil and gas in its natural setting. (*Ibid.*) The surface owner of real property has the exclusive right on his premises to drill for oil and gas, and he may transfer that right as a *profit à prendre* to another. (*Ibid.*)

With the use of depleted gas reservoirs for storage purposes the question naturally arises whether the owner of recovered oil and gas loses his ownership interest in the property by injecting it into a natural reservoir. The issue has not been determined in California, but the courts of a few other jurisdictions have considered the issue with conflicting results. (See Annot., Gas-Storage in Natural Reservoir (1964) 94 A.L.R.2d 543, and cases cited there. See also *Bezzi* v. *Hocker* (10th Cir. 1966) 370 F.2d 533, applying Oklahoma law.) If we were simply to choose between the conflicting decisions from other jurisdictions we would follow those which hold that ownership is not lost by injection into a storage reservoir, since they are the better reasoned and reach a more equitable result. (See *White* v. *New York State Natural Gas Corporation* (1960) W.D.Pa. 1960 190 F.Supp. 342, applying Pennsylvania law; *Lone Star Gas Co.* v. *Murchison* (Tex.Civ.App. 1962) 353 S.W.2d 870 [94 A.L.R.2d 529].)[9] Fortuitously, in this state we have a clear indication of legislative intent that an owner is not to be considered to have lost his ownership interest in gas by injecting it into an underground storage reservoir.

In 1975 the Legislature acted to end any uncertainty which might arise over a public utility's use of an underground gas storage reservoir. At that time section 613 was added to the Public Utilities Code to provide that a

---

[9]The cases which have held that the owner of natural gas loses his ownership interest in the gas by injecting into an underground storage facility have done so by analogy to the common law rule of animals *ferae naturae*. The common law held that wild animals could be owned only so long as they remained captive and that upon escape and return to their natural habitat any ownership interest was lost. (See *Hammonds* v. *Central Kentucky Natural Gas Co.* (1934) 255 Ky. 685 [75 S.W.2d 204].) So it is with natural gas where the analogy is accepted. (*Ibid.*) However, the courts which have concluded that injection into a storage reservoir does not divest the owner of his personal property interest in the gas have done so by recognizing that natural gas is not perfectly analogous to wild animals. (See *White* v. *New York State Natural Gas Corporation, supra,* 190 F.Supp. 342; *Lone Star Gas Co.* v. *Murchison, supra,* 353 S.W.2d 870.) In *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at page 99, we recognized that oil and gas interests are sui generis and that analogies drawn from other fields are often inapt for comparison. This would lead us to reject the analogy attempted in *Hammonds* and other cases reaching similar results. However, even if we accepted the comparison it would lead to a contrary result in California. In Civil Code section 996, our Legislature has provided that fur-bearing animals brought into captivity are personal property and remain so regardless whether they remain in or escape from captivity. This is a legislative abrogation of the common law with respect to commercially valuable living wild animals, and if we attempted to analogize commercially valuable oil and gas to the law of wild animals we would conclude that the policy of this state is that the ownership interest gained from capturing valuable natural commodities is not defeated by "escape" of the commodity.

gas corporation may condemn any property necessary for the construction and maintenance of its gas plant. (Stats. 1975, ch. 1240, § 65, p. 3178, operative July 1, 1976.) Section 221 of that code was amended to provide specifically that "gas plant" includes underground storage. (Stats. 1975, ch. 1240, § 64, p. 3178.) The Law Revision Commission stated that the amendment was intended to make express the inherent right of a gas corporation to condemn property for the underground storage of natural gas. In this legislation we find clear legislative recognition of underground storage of natural gas and the intent that gas in underground storage is to be considered to be within the gas corporation's "gas plant." It would be entirely inconsistent with this policy to hold that a gas corporation is somehow divested of its ownership of gas simply because it stores it underground. Accordingly, we conclude that once gas is reduced to personal possession the owner of the gas is not to be considered to have been divested of ownership simply because it stores the gas in an underground storage reservoir. To be sure an owner who allows gas to escape to the property of another may be liable in trespass, nuisance, inverse condemnation, or on other applicable theories, but it still remains the owner of such gas.

Since we conclude that the law of capture does not apply to divest PGandE of the ownership of its injected gas, it is necessary to determine whether defendants acquired an interest in that gas by the 1963 agreement. The trial court concluded that they did acquire such rights as a matter of law. We find the decision of the trial court to be in error and to compel the reversal of that aspect of the judgment.

In paragraph 15 of the 1963 agreement PGandE agreed, subject to various other terms and conditions, to pay defendants as royalty and rent one-sixth of the gross proceeds derived from the sale of "gas produced hereunder from Parcel III . . . ." It was further provided in the last clause that "[t]he provisions of this Paragraph 15 shall not apply to any gas which has been injected and stored in and thereafter withdrawn from Parcels I or II." The trial court's ruling was made on motion of the defendants before the first witness was called. Defendants argued that the lease agreement was not ambiguous and that since it is not ambiguous it is unnecessary to consider extrinsic evidence to interpret it. Defense counsel's argument was that since the agreement "says all gas produced, . . . it doesn't make any difference whether it's extraneous gas. I use the term extraneous to mean injected and stored gas; okay? And in fact, it doesn't tell you what kind of gas they are going to pay a royalty on. It simply says all gas produced. Therefore, it means that it is unambiguous." Counsel for PGandE retorted that the "term, 'gas produced,' is an ambiguous term, in that it does not say in the lease, on the face of the lease, and that's what we are looking at, as to whether or not it refers to injected gas or native gas or both." Commenting on the last clause, PGandE's

counsel observed that defense counsel had pointed to "the very final para-graph where it says that paragraph 15 shall not apply to injected gas in Parcels I and II. They, therefore, infer—they make an inference that, since it doesn't say III, that paragraph 15 does not apply to Parcel III. . . . In this particular situation, there will be an offer of proof that the parties, Mr. Zuckerman and the known parties on behalf of PG&E, each believed that the injected gas was solely on Parcel No. I. Neither party ever contemplated that the injected gas was in Parcel III." Defense counsel responded that he "wasn't inferring anything at all from the last clause of paragraph 15. . . . I don't think it makes any difference whether the clause is in there or not in there for the purposes that we are talking about today." (*Ibid.*) PGandE then offered to prove that at the time of the 1963 agreement neither party believed the injected gas would intrude into parcel III. PGandE's counsel said: "Going back to the point raised by defense counsel, that evidence of undisclosed intent of parties is not permissible to determine what was meant when the contract was entered into, as part of our offer of proof, and I should have also included, there are numerous documents which our PG&E filed, and copies have been made available to defendant. [¶] Those documents show that there was corre-spondence between Mr. Zuckerman and Mr. Johns of PG&E, that the descriptions of the parcels, Parcels I, II and III, were agreed upon by the parties before ever entering into the agreement, that all of the parties under-stood that as Parcels I, II and III. There were certain items which we found in each of those parcels, and Mr. Johns and Mr. Zuckerman clearly set out that Parcel I was the storage area. [¶] This is also extrinsic evidence showing what was the intent of PG&E at the time. It's not an undisclosed intent of the parties. This was an intent of both parties, discussed between both parties, agreed to by both parties as to what this contract was supposed to be about. [¶] And there has also been testimony from Mr. Zuckerman on that issue to support our understanding of what these documents in fact purport, what were the negotiations between the parties at the time that they drew up the contract, and as an offer of proof, we have numerous documents, Your Honor, going to that, and also documents wherein PG&E indicated that the reason they were entering into this lease was to permit Mr. Zuck-erman to drill in the deep zones in Parcel III, because that's where they felt there may have been a possibility of some further gas and not in any storage zone area. [¶] The reason they permitted drilling in Parcel III is perhaps there was—there was going to be productive gas at the 10,000-foot level or so, or 12,000-foot level, wherever they would find the winter sands, and this is all part of the offer of proof going to what was intended by the parties when they drew up this lease." Despite this offer of proof the court ruled that the contract was unambiguous, and that it required PGandE to produce and pay royalties upon gas from parcel III without regard to whether it was native or injected gas.

The court's ruling constituted reversible error. Under the California parol evidence rule a party is entitled to introduce any extrinsic evidence

which may aid in an interpretation of a written contract. (Code Civ. Proc., § 1856, subd. (g); see generally, 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, § 960, p. 908.) The test is not whether the agreement appears to the court to be clear and unambiguous on its face, but whether the extrinsic evidence is offered to support a meaning to which the language of the instrument is reasonably susceptible. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) As Jefferson notes, this holding makes "extrinsic evidence admissible to interpret or explain the meaning of a written instrument even though, on its face, the written instrument appears not to lend itself to the meaning contended for by the party-proponent of the extrinsic evidence because of the instrument's seemingly plain and unambiguous language." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Parol Evidence Rule, § 32.2, p. 1139.) "Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at pp. 39-40, fn. and citations omitted.) If, after considering the evidence, the court concludes that it does not support a meaning to which the agreement is reasonably susceptible then the evidence may be rejected. (*Ibid.*) But it is reversible error to refuse to consider the evidence based upon a conclusion that the agreement is clear on its face. (*Ibid.*) ■ Here the trial court erroneously refused to even provisionally consider the extrinsic evidence because of its conclusion that the agreement was clear on its face and from that error reversal must follow.

■ Defendants insist, however, that the court could properly exclude PGandE's extrinsic evidence under the rule that precludes evidence of an undisclosed intention from controverting the objective meaning of a contract. That rule simply prohibits a party from saying one thing but meaning another. (See *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13].) It does not preclude a party from introducing extrinsic evidence to establish what the mutually understood meaning of the contract was. As noted in *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, words do not have absolute and constant referents; the meaning of particular words or groups of words varies with the verbal context and surrounding circumstances and purposes, and the education and experience of the parties. (69 Cal.2d at p. 38.) While a party may not testify to his undisclosed subjective intent in entering into an agreement, the rule does not preclude admission of evidence of the surrounding circumstances, usage and custom in the industry, negotiations and discussion, or any other extrinsic evidence which may shed light on the mutual intention of the parties. (*Ibid.; Mission Valley East, Inc.* v. *County of Kern* (1981) 120 Cal.App.3d 89, 98 [174 Cal.Rptr. 300].) ■ PGandE's offer of proof clearly establishes that it was this latter type of evidence and not a mere

undisclosed subjective intent that it sought to introduce. It was error to exclude such evidence without at least provisionally considering it.

Nor can we accept the claim that PGandE failed to make an adequate offer of proof. ■ Normally the exclusion of evidence will not be considered on appeal unless the substance, purpose and relevance of the excluded evidence was made known to the trial court. (Evid. Code, § 354, subd. (a).) But "[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal, and an offer, if made, may be broad and general." (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522 [297 P.2d 428]; *Montez* v. *Superior Court* (1970) 10 Cal.App.3d 343, 351 [88 Cal.Rptr. 736]. See Evid. Code, § 354, subd. (b).) ■ This is precisely the type of case in which a complete offer of proof is unnecessary. The specific reason for defendants' motion was to "short-circuit" the need to have witnesses appear on the issue. In response to defendants' aggressive but misguided advocacy the court misapplied the parol evidence rule and ruled that extrinsic evidence would not be received in aid of interpretation of the contract. PGandE's offer of proof was adequate under these circumstances. (*Montez* v. *Superior Court, supra,* 10 Cal.App.3d at p. 351; see *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 36, fn. 1.)

■ In any event, the trial court erred in concluding that the agreement was clear and unambiguous on its face. The agreement was negotiated because the older agreement did not require PGandE to explore for additional natural oil and gas reserves on McDonald Island for so long as it operated the storage reservoir and did not permit defendants to do so. Defendants, however, believed that there may have been additional undiscovered oil and gas native to the property. The clear intent of the agreement was to permit such exploration while maintaining the integrity of the storage facility. Throughout the agreement numerous provisions are found to protect the integrity of the storage facility and PGandE's right to gas injected and stored there. In every instance throughout the agreement where the parties referred to the extraction of injected gas from the storage reservoir they used the word "withdrawn" or "withdrawal" while the word "produced" was restricted to reference to extraction of newly discovered native gas. If the word "produced" in paragraph 15 refers to the extraction of injected gas from the storage reservoir, then it is the only instance in a 40-page agreement where it was so used.

As we have noted, the final provision in paragraph 15 provides: "The provisions of this Paragraph 15 shall not apply to any gas which has been

injected and stored in and thereafter withdrawn from parcels I or II." All of the injected gas was injected into and stored in parcel I. The operation of the Zuckerman-Henning well on parcel III caused the gas to migrate into parcel III, and thus to be "withdrawn" from parcel I. This would make it appear that the royalty provisions of paragraph 15 were not intended to apply to injected gas. The trial court held just the opposite. It concluded with respect to the final provision of paragraph 15 that it "is quite clear that Parcel III was not intended to be included in that exclusion . . . ." That provision cannot be so easily disregarded. In other parts of the agreement PGandE was given the sole and exclusive right to inject, store, and withdraw gas from parcels I and II, free of any royalty interest. Paragraph 15 deals with the royalties to be paid to defendants for gas produced from wells on parcel III. Unless the last provision of that paragraph was intended to insure that injected gas would be free from those royalty interests it would have no meaning whatsoever. It is not to be lightly assumed that the parties to a contract included provisions which have no meaning. It is a general rule of construction that an interpretation of a contract should, where possible, give effect to every provision. (Civ. Code, § 1641; *Moore* v. *Wood* (1945) 26 Cal.2d 621, 630 [160 P.2d 772]; *General Ins. Co.* v. *Truck Ins. Exch.* (1966) 242 Cal.App.2d 419, 426 [51 Cal.Rptr. 462].) Moreover, since that final provision of paragraph 15 is a limiting provision and was placed within paragraph 15 it must be construed as a limitation upon the rights granted in paragraph 15. As such it can only have been intended to exclude injected gas from the royalty provisions of paragraph 15.

The interpretation of a written agreement is a question of law. Where there is no extrinsic evidence, or the extrinsic evidence is not conflicting (and therefore poses no question of credibility), then a reviewing court must make an independent determination of the meaning of the agreement. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 44 [154 Cal.Rptr. 652].) If we were to construe the agreement on its face without reference to extrinsic evidence we would reject the trial court's interpretation and find in favor of PGandE since it seems clear on the face of the agreement that the parties did not intend that defendants would acquire any rights in the stored gas. But in doing so we would be engaging in the same error made by the trial court. The trial court's ruling precluded introduction of extrinsic evidence by PGandE and made it unnecessary for defendants to introduce such evidence. Since extrinsic evidence must be considered before it can be determined whether it supports a meaning to which the agreement is reasonably susceptible, the matter must be remanded so that both PGandE and defendants will have the opportunity to produce any evidence they believe supports their interpretation of the agreement.

Two further points must be addressed. Defendants contended, and the trial court found, that PGandE is estopped from denying that it must pay defendants a perpetual royalty on injected gas which can be extracted through the Zuckerman-Henning well. The record does not support the application of estoppel in that manner. Evidence Code section 623 provides that "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." Estoppel then is an equitable doctrine which prevents a party from profiting from the detriment he induced another to suffer. ▪▪ "The doctrine acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine." (*Peskin* v. *Phinney* (1960) 182 Cal.App.2d 632, 636 [6 Cal.Rptr. 389].) The essence of an estoppel is that a party who is actually and permissibly ignorant of the facts has been induced to act to his detriment by representations or concealment by a party with superior knowledge who intended to induce action. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 132, pp. 5351-5352.) ▪▪ Defendants argue that from 1967 to 1980 PGandE extracted gas from the Zuckerman-Henning well and paid royalties upon it although it was aware that the deposit was connected to the storage reservoir and that at least some of the gas extracted was injected rather than native gas. Defendants conclude from this that PGandE should be estopped from refusing to continue to pay royalties on injected gas in perpetuity. This is not a defensive use of the estoppel doctrine. We find no detrimental reliance suggested by the record and no basis whatsoever for the application of an estoppel in this manner.

▪▪ We do agree with the trial court, however, that PGandE cannot be permitted to recover excess royalties that it did pay to defendants. The record established that during the period PGandE was extracting gas and paying royalties on the Zuckerman-Henning well it paid royalties on more gas than was originally in place in the deposit, and thus in fact paid royalties on some injected gas. ▪▪▪ PGandE made those payments with an awareness of the facts, and defendants accepted the payments in good faith and cannot be made to refund them at this time.[10]

---

[10]Defendants also suggest that the PGandE's action supports the interpretation of the contract found by the trial court. The subsequent conduct of the parties to a contract may be considered in interpreting the contract. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 527, p. 449.) Of course, PGandE offered a well supported and reasonable explanation for why it paid the royalties from 1967 to 1980, which would diminish the value of that conduct as evidence for defendants' position. Nevertheless, this is not a question we must resolve. The subsequent conduct of the parties to a contract is one of a variety of permissible types of extrinsic evidence which may be considered in interpreting a contract. Since the trial court precluded PGandE from offering its extrinsic evidence it would be improper and unfair to consider extrinsic evidence on appeal without the opportunity for a retrial.

██ Finally, the trial court found that PGandE abandoned the gas in place under parcel III as of August 1, 1980, and awarded the sum of $2,938,000 to defendants as an alternative to the mineral interest/breach of contract damages. There is not a scintilla of evidence in the record to support an abandonment. ██ Abandonment of property requires both nonuser and the intent to abandon. (*Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 889 [69 Cal.Rptr. 612, 442 P.2d 692].) Before an abandonment may be found it is necessary to establish nonuser accompanied by unequivocal and decisive acts showing an intent to abandon. (*Id.,* at p. 890.) ██ In this case PGandE was placed in a difficult position when it became obvious that the storage reservoir was not limited to the confines of parcel I as had been believed. But everything PGandE did both before and after was done to protect its interests in the storage reservoir and the injected gas. The finding of abandonment is without support in the evidence and must be reversed.

In summary, it appears that the 1963 agreement was negotiated in order to permit the exploration and production of native gas in McDonald Island outside of the storage reservoir while protecting PGandE's storage rights. Pursuant to that agreement PGandE explored for and discovered a deposit of native gas in parcel III which, it turned out, was connected to the storage reservoir. PGandE produced and paid for all of the native gas which was within the deposit. We conclude that the law of capture does not give defendants mineral interests in the injected and stored gas in the reservoir. We also conclude that the trial court erred in concluding that the 1963 agreement gave defendants such rights on its face and as a matter of law. We reverse the judgment and remand so that the parties can produce any extrinsic evidence they believe supports the interpretation they urge. In view of this resolution it is unnecessary to consider whether the trial court's assessment of the value of defendants' mineral interests, based entirely upon the valuation of Mr. Paschall, is supported by the evidence and we express no opinion on that question.

### III

#### SEVERANCE DAMAGES

██ The trial court awarded severance damages in the amount of $358,000. This amount represented the acceptance without question of the testimony of Mr. Paschall. Paschall testified that in the event wildcat wells were to be drilled for the purpose of exploring the earth beneath the condemned storage reservoir they would have to be slant drilled from outside the property. He estimated that slant drilling would cost approximately $179,000 more than straight drilling to reach a depth of 10,000 to 12,000 feet, and he concluded that the additional cost of two wells to that depth

would represent severance damages. The trial court awarded damages for two such wells as severance damages.

We agree with PGandE that the award for severance damages cannot stand. ■■■ A condemnation award cannot be based upon a speculative projected use for the property claimed by the owner. (*City of Los Angeles* v. *Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 488 [128 Cal.Rptr. 436, 546 P.2d 1380]; *County of Los Angeles* v. *Bean* (1959) 176 Cal.App.2d 521, 528 [1 Cal.Rptr. 464].) In *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed, supra,* 215 Cal.App.2d at page 70, this court reversed an award of severance damages because it was based upon "a conjectural buyer's conjectural fears of conjectural flooding created by conjectural levees." ■■■ The award for severance damages here is equally conjectural. There is nothing in the record to suggest that the property is suited to further oil and gas exploration,[11] that any potential oil or gas deposit at a depth beneath the condemned storage reservoir could not be produced from wells outside the condemned area, that it would be economically or geologically advisable to conduct such exploration, or that if exploration were conducted it would be defendants rather than an oil and gas lessee that would bear the burden of any added costs of drilling. The award for severance damages is totally speculative and cannot stand.

IV

PREJUDGMENT INTEREST, LITIGATION EXPENSES, ATTORNEYS' FEES AND SANCTIONS

■■■ PGandE contends that the trial court erred in awarding defendants prejudgment interest on their awards. Defendants have not responded to this contention. The judgment provides for the payment of interest at the legal rate on the award for the storage rights from August 1, 1980, and from February 22, 1982, on the mineral rights. At the time judgment was entered in this case Code of Civil Procedure section 1268.310 provided: "The compensation awarded in the proceedings shall draw legal interest from the earliest of the following dates: [¶] (a) The date of entry of judgment. [¶] (b) The date the plaintiff takes possession of the property. [¶] (c) The date after which the plaintiff is authorized to take possession of the property as stated in an order for possession." (Stats. 1975, ch. 1275, § 2, p. 3461.) Although PGandE applied for an order of possession in 1982, its application was denied. Since PGandE neither took, nor had the right to take, possession

---

[11]In fact, the condemned parcel has already been explored for oil and gas to a depth below 10,000 feet subsea in the initial exploratory drilling conducted with the Zuckerman-Henning No. 1 well. The negative results experienced in that exploration would indicate that further exploration is unwarranted, and nothing in the record would suggest otherwise.

of defendants' property before the entry of judgment, the statute requires that interest run from the date of the entry of judgment. The award of prejudgment interest was therefore erroneous and must be reversed.

The trial court awarded defendants their litigation expenses, but denied an award of attorneys' fees. Defendants filed a cross-appeal from the order denying attorneys' fees, and have moved for sanctions against PGandE for a frivolous appeal. Since we find that the judgment must be reversed on all elements of damages awarded by the trial court the award of litigation expenses must be reversed and it is unnecessary to consider at this time whether attorney's fees should be awarded. Since we find the appeal meritorious we obviously deny the request for sanctions.

The judgment is reversed and the cause is remanded to the trial court for further proceedings in accordance with the views expressed in this opinion. Defendants shall recover costs.

Blease, Acting P. J., and Sims, J., concurred.

A petition for a rehearing was denied on March 12, 1987, and the following opinion was then rendered:

**THE COURT.\*—** On petition for a rehearing the defendants contend that our decision erroneously awarded costs to PGandE. The general rule on appeal is that the prevailing party is entitled to costs. (Cal. Rules of Court, rule 26(a).) However, with respect to condemnation actions Code of Civil Procedure section 1268.720 provides: "Unless the court otherwise orders, whether or not he is the prevailing party, the defendant in the proceeding shall be allowed his costs on appeal. This section does not apply to an appeal involving issues between defendants." This statutory rule favoring an award of costs to the defendant in an eminent domain action has a constitutional origin. The constitutional requirement of just compensation dictates that the defendant's award should not be diminished by the costs which attach to the process of ascertaining the award. (See *City of Los Angeles* v. *Ricards* (1973) 10 Cal.3d 385, 390-391 [110 Cal.Rptr. 489, 515 P.2d 585]; *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 68-71 [37 Cal.Rptr. 74, 389 P.2d 538]; *Sacramento Drainage Dist.* ex rel. *State Rec. Bd.* v. *Reed* (1963) 217 Cal.App.2d 611, 612-613 [31 Cal.Rptr. 754].) There are, to be sure, circumstances where an award of costs to the condemner is permissible. (See *Yolo Water etc. Co.* v. *Edmands* (1922) 188 Cal. 344, 346-347 [205 P. 445] [appeal wholly the fault of the defendant for causelessly insisting the plaintiff continue an action it desired to dismiss]; *Oakland* v. *Pacific Coast*

---

*Before Blease, Acting P. J., Sparks, J., and Sims, J.

*Lumber Co.* (1916) 172 Cal. 332, 335-337 [156 P. 468] [costs may be awarded to plaintiff where the defendant unsuccessfully appeals]; *Los Angeles etc. Ry. Co.* v. *Rumpp* (1894) 104 Cal. 20, 23-24 [37 P. 859] [defendant required to pay costs, pursuant to statute, for a second trial granted on her application where the award was less than in the first trial].) And a court may deny particular items of costs where they are not incurred reasonably and in good faith. (*City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d at p. 390; *San Francisco* v. *Collins* (1893) 98 Cal. 259, 263 [33 P. 56].) But in the absence of such circumstances the constitutional requirement of just compensation is a limitation upon the phrase "Unless the court otherwise orders" in Code of Civil Procedure, section 1268.720. Although, as PGandE points out, this action involved a cross-complaint for such things as nuisance, breach of lease, trespass and estoppel, the primary issues, both at trial and on appeal, involved the amount PGandE must pay to condemn defendants' property. Accordingly defendants are entitled to their costs even though PGandE is the prevailing party. The opinion is modified to award costs to defendants.

■■■ Defendants also contend that our decision was erroneous with respect to prejudgment interest. Code of Civil Procedure section 1268.310 provides that interest on a condemnation award accrues from the earliest of the date of judgment, the taking of possession, or an order authorizing the taking of possession. In its judgment the trial court held that PGandE was required to pay royalties to defendants for so long as it operates the storage reservoir. In view of this finding it could not be said that PGandE took possession of the property since the payment of royalties entitled PGandE, as lessee, to the possession and use of the property, and the receipt of the emoluments of ownership by defendants precludes a finding they were deprived of possession. Accordingly, an award of prejudgment interest was improper on the findings of the trial court. However, we have reversed the judgment holding that PGandE is required to pay a continuous royalty to defendants. If PGandE prevails on this issue upon retrial, then it may be held to have taken possession when it ceased paying royalties to defendants, since it was storing gas in the condemned parcel at that time. Our opinion on appeal is without prejudice to the trial court to determine the date PGandE actually took possession of the condemned property in light of its other findings upon retrial.

None of defendants' other contentions on petition for rehearing warrants discussion. The opinion is modified to provide defendants, and not PGandE, shall recover their costs on appeal.

A petition for a rehearing was denied March 12, 1987.