Filed 5/13/13  P. v. Griffin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068314 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F08267) |
| v. | |
| TIMOTHY GRIFFIN, | |
| Defendant and Appellant. | |

During bifurcated guilt and sanity proceedings before the trial court, defendant Timothy Griffin pleaded guilty to all charges—four counts of robbery, seven counts of assault with a firearm, and two counts of carjacking—received a sentencing lid of 23 years four months, and waived his right to a jury trial on the issue of sanity. After the sanity phase, the court found defendant failed to meet his burden of proof to show he was insane at the time of the offenses.

1

Defendant appeals his conviction, alleging (1) his jury waiver for the sanity trial was procured involuntarily due to judicial involvement, (2) this judicial involvement constitutes judicial plea bargaining that renders the sanity jury waiver invalid, and (3) there was insufficient evidence to support the trial court's finding that defendant failed to meet his sanity burden of proof. We find the trial court did not engage in judicial plea bargaining, and the trial court's sanity finding was supported by sufficient evidence. Therefore, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2008, defendant, with a getaway bicycle waiting outside, armed with a loaded semiautomatic handgun and wearing a hoodie and a mask, went into a Wells Fargo Bank. Holding his gun, defendant jumped over the counter and said, " 'Now, everyone is going to cooperate with me, right?' " Defendant took money from each cash drawer. A bank customer, who had retrieved his own gun from his car, pointed the gun at defendant, demanding that defendant drop his gun. Defendant ducked below the counter, stood back up pointing his gun at the armed customer, and fled out the back door of the bank, leaving his escape bicycle behind.

With cash in hand, defendant ran into an open garage to hide. When the owners of the house emerged, defendant stole their car at gunpoint and fled. Defendant abandoned the stolen vehicle and disposed of all clothing connecting him to the scene of the crime. Defendant went to his truck, where he left the gun and submerged the stolen money underwater in a cooler, thinking there might be a paint bomb in the money for detection purposes.[1] Defendant then returned in his truck to the hotel where he was staying with his girlfriend and went to the swimming pool.

---

[1] Included within the cash taken were three "ETS"—electronic transmitting system—tags attached to $20 bills.

Police officers located defendant's truck in the hotel parking lot after tracking the signal from the electronic transmitter and, with the help of a police dog, tracked the driver of the truck to the hotel's pool area. The police dog honed in on defendant and the officers arrested him.

Defendant claimed he had been at the hotel all day and had only left his room to buy a cup of coffee. Defendant described a woman who had served him; however, the person working at that particular coffee shop did not match defendant's description. Defendant subsequently admitted to robbery and carjacking, and the money and handgun were recovered from defendant's truck.

On January 24, 2011, defendant pleaded guilty to four counts of robbery, two counts of carjacking, and seven counts of assault with a firearm, and the trial court indicated a sentencing lid of 23 years four months. The relevant part of the plea colloquy follows:

"THE COURT: . . . Counsel, it's my understanding that there has been a resolution to the first phase of the trial, that is, the guilt phase, and there will be a court trial as it relates to the sanity phase.

"The previously offered 19 years four months [by the prosecutor], there were certain conditions that attached to that. The Court has extended a 23-year four-month offer, which is a lid offer that gives [defense counsel] an opportunity to make additional arguments to the Court if and when we have a sentencing hearing in this matter.

"But in any event, it's my understand[ing], [defense counsel], that your client is prepared at this time to enter pleas of guilty and admit all the allegations to each and every count, correct? [¶] . . . [¶]

"THE COURT: . . . [I]s that the proposed disposition, your client is going to plead to all charges, admit all allegations?

3

"[DEFENSE COUNSEL]: Is that correct, [defendant]?

"[DEFENDANT]: Yes, Your Honor. [¶] . . . [¶]

"THE COURT: You understand that you are going to be waiving your right to have a jury trial decide whether or not you were sane at the time these offenses were committed?

"[DEFENDANT]: Yes, Your Honor.

"THE COURT: You understand you have a right to have a jury make that decision?

"[DEFENDANT]: Yes, Your Honor.

"THE COURT: Understanding that right, do you waive it so that this Court, myself, will be making that determination after hearing all of the evidence in that regard?

"[DEFENDANT]: Yes, Your Honor.

"THE COURT: Do you join in that waiver, [prosecutor]?

"[PROSECUTOR]: Yes, Your Honor.

"THE COURT: [Defense counsel]?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: [Prosecutor], this was a prior offer by the People, 23 years four months. Do the People have any position on this at this time?

"[PROSECUTOR]: Yes, Your Honor, just to clarify the record, this was the offer that extended from the [superior court readiness conference] date to Wednesday, January 28th of 2009. What happened on January 28th of 2009, is that shortly before the preliminary hearing, defense counsel and the District Attorney who had represented—or our office before I had the case agreed to a slightly lower disposition of 19 years four

months with the understanding that the defendant would resolve before prelim[inary hearing,] any witnesses were called, anymore time, anymore resources were consumed.

"We are now almost two years later, we've done significant prep work for trial in terms of law and motion as well as the inconvenience upon the witnesses to be served subpoenas over and over again.

"While we recognize this is the defendant's first offense, this is a very serious offense and there are a number of real victims, the defendant pointed a gun at different points and took property from.

"We feel this is a serious crime, but we would submit to the Court on the Court offer.

"THE COURT:  The record should also reflect over the weekend the People had agreed to extend a 19-year four-month offer to the defendant, and the defendant today now is pleading 23 years and four months.  [¶]  [Defense counsel], have you discussed with your client the elements of the charged offenses and the possible defenses which he may have?

"[DEFENSE COUNSEL]:  We have.

"THE COURT:  Have you explained to him his rights?

"[DEFENSE COUNSEL]:  I have.

"THE COURT:  Have you explained the direct consequences which will result from a plea of guilty to the charged offenses?

"[DEFENSE COUNSEL]:  Yes.  [¶]  We have talked about various permutations of maximum punishment based upon factual—potential factual interpretations that a Court could come up with, and as I think we already discussed on the record, . . . there's a

5

wide variance between the charge and what could be a maximum depending on what the Court would find the facts at the end of a sentencing hearing.

"THE COURT: And my understanding that at least it would be 41 years and four months.

"[DEFENSE COUNSEL]: Yes.

"THE COURT: All right. Are you satisfied that your client understands all of these matters?

"[DEFENSE COUNSEL]: I believe he understands that."

The prosecutor proceeded to state a factual basis for all charges. Defendant agreed a factual basis existed for the charges.

"THE COURT: Again, [defense counsel], you would agree that the potential sentence for a plea to all of these counts and special allegations is at least 41 years four months, would you agree with that?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: Do the People agree . . . as well?

"[PROSECUTOR]: Yes, Your Honor.

"THE COURT: However, the understanding today, [defendant], is that you would receive no more than 23 years and four months in state prison as a result of your pleas. [¶] Do you understand that?

"[DEFENDANT]: Yes, Your Honor."

The court then advised defendant as to the consequences of a guilty plea and explained defendant's *Boykin/Tahl* constitutional rights,[2] all of which defendant waived,

---

[2] *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

including his right to a jury trial. The court took guilty pleas and admissions for all charges and enhancements.

At a trial to the court in the sanity phase, defendant testified and offered expert testimony opining that he lacked the capacity to distinguish right from wrong at the time of the robbery (part of the legal test for sanity). Defendant also offered, through testimony, some evidence of a prior delusional episode. Through expert testimony and cross-examination of defendant, the People offered evidence indicating that defendant had the capacity to distinguish right from wrong. After the trial to the court, the court found defendant failed to prove insanity by a preponderance of the evidence and sentenced him to 19 years eight months.

## DISCUSSION

### I. Sanity Jury Waiver Was Voluntary Because There Was No Promise of Benefit or Leniency

Defendant argues that his jury trial waiver regarding sanity was involuntary because it was conditioned on a sentencing lid promised by the trial court, which constitutes judicial plea bargaining. We disagree.

"The right to a trial by jury is . . . a 'fundamental constitutional right' " pursuant to the Sixth Amendment of the federal Constitution. (*People v. Collins* (2001) 26 Cal.4th 297, 304 (*Collins*).) A defendant may waive the right to a jury trial if the waiver "is knowing and intelligent" (*id.* at p. 305), and if it is an "express waiver on the record" (*Tahl, supra,* 1 Cal.3d at pp. 132-133). Moreover, "the state may not punish a defendant for the exercise of a constitutional right, or promise leniency to a defendant for refraining from the exercise of that right." (*Collins*, *supra*, 26 Cal.4th at p. 306.) If a trial court does induce a jury trial waiver through some promise of benefit, the waiver "amounts to a 'structural defect in the proceedings' requiring that the judgment of conviction be set aside . . . ." (*Id.* at p. 312.)

7

Defendant likens his case to *Collins*.  The defendant in *Collins* had indicated his intention to waive a jury trial when the court asked whether the defendant understood that the court was "not promising [him] anything just to get [him] to waive jury?"  (*Collins*, *supra*, 26 Cal.4th at p. 302, italics omitted.)  The defendant responded, "I was told that it would—that it was some reassurance or some type of benefit."  (*Ibid*.)  The court stated, "Okay.  I think that—I think what [defense counsel] may have been referring to is that I indicated to counsel when somebody mentioned that this issue is going to be discussed with you that there might well be a benefit in it.  Just by having waived jury, that has some effect on the court.  Do you understand that?  By not taking up two weeks' time to try the case, but rather giving—just having it in front of a judge alone. . . .  Do you understand that?"  (*Ibid.*)  In *Collins*, the defendant's jury trial waiver was conditioned on "a benefit" offered by the court; therefore, the defendant's waiver was not "knowing, intelligent, and voluntary.  The form of the trial court's negotiation with defendant presented a 'substantial danger of unintentional coercion.' "  (*Id.* at p. 309.)  This constituted a " 'structural defect in the proceedings' " and required the judgment be set aside.  (*Id.* at p. 312.)

Despite defendant's contentions here, such a factual scenario is not before us.  Here, the trial court indicated a sentencing lid that was based in part on a prior prosecution offer; defendant indicated his intention to plead guilty to all charges and to waive his right to a jury trial; the court explained the consequences of pleading guilty including relinquishment of the right to a jury trial; and defendant waived his jury trial right and pleaded guilty.  Defendant's waiver was thus an "express waiver on the record."  (*Tahl*, *supra*, 1 Cal.3d at pp. 132-133.)  There was no reference to a "benefit" or that defendant's waiver may have "some [beneficial] effect on the court."  (*Collins*, *supra*, 26 Cal.4th at p. 302.)  As there was no offer of a benefit or leniency by the trial court, the jury trial waiver was voluntary unless the sentencing lid constitutes a judicial plea

bargain.  As it does not (as we explain in pt. II of the Discussion that follows), defendant's jury trial waiver was voluntary.

## II.  Sanity Jury Waiver Was Valid Because There Was No Judicial Plea Bargaining

Defendant argues that his sanity jury waiver is invalid because either (1) the sanity jury waiver was "the trial court's doing" (not initiated by the prosecution) and therefore not part of the plea agreement or (2) even if the sanity jury waiver is deemed part of the plea agreement, it must nonetheless be severed due to judicial plea bargaining.  Under either theory, defendant does not seek reversal of the guilty plea, but seeks remand for a subsequent jury trial on the issue of sanity.  In response, the People contend that defendant "wants his proverbial cake and to eat it too.  He wants to leave intact the 'lid' disposition that he received by entering guilty pleas, yet have another bite at an insanity verdict, now that he was found sane by the trial court."  We agree with the People.

### A.  The Guilt Phase and Sanity Phases Are Bifurcated Parts of One Trial

Defendant concedes that he waived a jury trial when he pleaded guilty.  Defendant argues, however, that this waiver does not extend to the sanity phase:  "Here, however, we are talking about the trial court's solicitation of a jury waiver in a *different* trial, one that was *not* resolved by the defendant's pleas and admissions."  This argument is without merit.  Case law has concluded, relying on the "one trial" principle, that a defendant's waiver of jury on the issue of guilt extends to the issue of sanity as a defense, unless the defendant "specifically demands" a jury on the issue of sanity.  (*People v. Jarmon* (1992) 2 Cal.App.4th 1345, 1355.)  Here, defendant never "specifically demand[ed]" a jury on the sanity issue; indeed, he expressly agreed to a court trial. Therefore, when defendant waived his jury trial by pleading guilty, he also waived his jury trial in the sanity phase.

## B.  There Was No Judicial Plea Bargaining

This court, in *People v. Woosley* (2010) 184 Cal.App.4th 1136 (*Woosley*), distinguished between a court that improperly engages in plea bargaining and a court that properly indicates a sentence or a sentence lid.  As to the former, "The process of plea bargaining . . . contemplates an agreement negotiated by the People and the defendant and approved by the court.  [Citations.]  Pursuant to this procedure the defendant agrees to plead guilty in order to obtain a reciprocal benefit, generally consisting of a less severe punishment than that which could result if he were convicted of all offenses charged." (*Woosley*, at p. 1145.)  "However, the court has no authority to substitute itself as the representative of the People in the negotiation process and under the guise of 'plea bargaining' to 'agree' to a disposition of the case over prosecutorial objection." (*People v. Orin* (1975) 13 Cal.3d 937, 943.)  Such conduct "implicates the separation of powers doctrine" and constitutes "judicial plea bargaining—that is, disposing of charges over the objections of the prosecutor in order to induce a guilty plea"; such conduct "may 'contravene express statutory provisions requiring the prosecutor's consent to the proposed disposition, would detract from the judge's ability to remain detached and neutral in evaluating the voluntariness of the plea and the fairness of the bargain to society as well as to the defendant, and would present a substantial danger of unintentional coercion of defendants who may be intimidated by the judge's participation in the matter.' " (*Woosley*, *supra*, at pp. 1145-1146.)

In contrast to improper judicial plea bargains, says *Woosley*, are proper indicated sentences.  " 'In an indicated sentence, a defendant admits all charges, including any special allegations and the trial court informs the defendant what sentence will be imposed.  No "bargaining" is involved because no charges are reduced.' " (*Woosley*, *supra*, 184 Cal.App.4th at p. 1146.)  Therefore, indicated sentences " 'fall[] within the "boundaries of the court's inherent sentencing powers," ' " and do not implicate the separation of powers doctrine as judicial plea bargains do.  (*Id.* at pp. 1145-1146.)

In *Woosley,* the trial court offered a plea resolution over the prosecutor's repeated explicit objections.  (*Woosley*, *supra*, 184 Cal.App.4th at pp. 1140-1144.)  The offer appeared to be an indicated sentence because no charges had been reduced.  (*Id.* at pp. 1140-1141, 1147.)  However, the "sentence could be imposed only if the trial court dismissed the on-bail enhancement.  Therefore, it was more than just an indicated sentence; it included, anticipatorily, the dismissal of the on-bail enhancement." (*Id.* at p. 1147.)  By dismissing an on-bail enhancement, the court took on the role of the executive branch, thereby breaching the separation of powers doctrine and resulting in an illegal judicial plea bargain.  (*Ibid.*)

Here, defendant likens his case to *Woosley*, focusing on language in the plea colloquy to support his position.  In so doing, however, defendant ignores the bigger picture the record provides.  Rather than making a plea offer like the trial court in *Woosley*, it is apparent the trial court here referred to a previous off-the-record plea bargain between the prosecutor and the defense:  "THE COURT:  . . .  Counsel, it's my understanding that there has been a resolution to the first phase of the trial, that is, the guilt phase, and there will be a court trial as it relates to the sanity phase.  [¶] . . . The Court has extended a 23-year four-month offer, which is a lid offer . . . .  [¶]  But in any event, it's my understand[ing], [defense counsel], that your client is prepared at this time to enter pleas of guilty and admit all the allegations to each and every count, correct?"

Defendant contends the trial court's remark that "[t]he Court has extended a 23-year four-month offer, which is a lid offer" and the prosecutor's statement later that he "would submit to the Court on the Court offer" show that this was an improper plea offer from the court.  However, this is not *Woosley*.  This phrasing was merely an unfortunate way to refer to the sentence lid—a proper indicated sentence.  Significantly, the prosecutor did not object to the trial court's actions like the prosecutor in *Woosley*.  (See *Woosley*, *supra*, 184 Cal.App.4th at pp. 1140-1144.)  The trial court here did not dismiss

11

any charges or enhancements like the court in *Woosley*. Rather, defendant admitted all charges and enhancements and the court imposed a sentence within the court's indicated sentence lid. "[J]udicial plea bargaining," as defined in *Woosley*—"that is, disposing of charges over the objections of the prosecutor in order to induce a guilty plea," did not take place here. (*Woosley*, *supra*, at p. 1146.)[3]

### III.  There Was Sufficient Evidence to Support the Trial Court's Sanity Finding

Defendant initially argues that psychiatrist Jason Roof, M.D., the People's expert witness on sanity, failed to review "independently verifiable" evidence of a prior delusion of defendant's, and therefore the doctor's expert opinion lacks foundation and the judgment must be reversed for lack of substantial evidence. We disagree.

In this case, defense witness Kenneth King, a Sacramento County deputy sheriff, testified about defendant's prior delusional episode in June 2008 (approximately four months before the incident here). Defendant had called the police because he believed there were "four to five subjects with guns trying to enter his warehouse." When Deputy King and other officers arrived and found no evidence of intruders, they placed defendant in a squad car until he calmed down. Paul Mattiuzzi, Ph.D., the defense's expert witness on sanity, also mentions this June 2008 event in his report on defendant. Dr. Roof based

---

[3]  A recent decision from the California Supreme Court, *People v. Clancey* (Apr. 18, 2013, S200158) ___ Cal.4th ___, ___ [2013 Cal. Lexis 3315 at pp. *1, *27], concluded that an indicated sentence may contemplate the trial court's exercise of its sentencing discretion, including exercise of its discretion under Penal Code section 1385 to strike offenses or allegations in the interests of justice. The *Clancey* court perceived no statutory or constitutional basis for *Woosley*'s objection that a trial court's ordinary sentencing discretion necessarily excludes the power to dismiss under section 1385 in the context of an indicated sentence. (*People v. Clancey*, *supra*, ___ Cal.4th at p. ___ [2013 Cal. Lexis 3315 at p. *30].) Consequently, *Clancey* viewed a trial court's power to indicate a sentence as even broader than *Woosley* did, and therefore *Clancey* poses no problem to our resolution here.

12

his opinion that defendant had the ability to differentiate right from wrong (part of the legal test for saneness) in part on an absence of previous delusional episodes, and stated at trial that if defendant had had a previous delusional episode, he (Dr. Roof) "would consider" it but "[w]hether or not it would have an impact on my opinion, I don't know."

Relying on *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113 (*Zuckerman*), defendant argues that because there was some evidence of a prior delusional episode and Dr. Roof admits that he would have considered such an episode in reaching his expert opinion, his opinion lacks foundation and "the judgment must be reversed for lack of substantial evidence." However, defendant's argument is misplaced. *Zuckerman* involved an expert's valuation of real property, where the expert used a comparative property that "include[ed] various fixtures, rights, improvements, and personal property which the property being [valued did] not include." (*Id.* at p. 1130.) Therefore, the *Zuckerman* expert's opinion was based on facts wholly unsupported by the record. (*Ibid.*) Here, in contrast, Dr. Roof based his opinion on the police report, witness statements, statements by defendant to the police, psychiatric treatment records, Dr. Roof's own interview with defendant, and psychiatric testing. Evidence of a prior delusional episode was one factor to consider in reaching his opinion, and Dr. Roof's ignorance of this evidence goes to the credibility of his testimony rather than to its admissibility. (See *People v. Bassett* (1968) 69 Cal.2d 122, 146 & fn. 22 ["Assuming the necessary minimum acquaintance with the case in which he is called to testify, 'the extent of an expert's knowledge goes to the weight of his testimony, rather than to its admissibility.' "].) Therefore, unlike the expert in *Zuckerman*, Dr. Roof's opinion was based on facts supported by the record of the case and did not lack foundation.

Defendant then argues, more generally, that there is insufficient evidence to support the trial court's finding that defendant failed to show he was insane at the time of the offense. We disagree.

13

To prove not guilty by reason of insanity, a defendant must establish "by a preponderance of the evidence that he or she was incapable [(1)] of knowing or understanding the nature and quality of his or her act and [(2)] of distinguishing right from wrong at the time of the commission of the offense." (Pen. Code § 25, subd. (b).) Defendant concedes there is substantial evidence showing that he was capable of knowing or understanding the nature and quality of his acts at the time of the offenses, so the only issue of evidentiary sufficiency on appeal regarding this standard of legal insanity was whether defendant was capable of distinguishing right from wrong.

In reviewing this evidentiary sufficiency issue, we must determine whether, after viewing all of the evidence in the light most favorable to the judgment, there is substantial evidence to support the trier of fact's findings. (*People v. Johnson* (1980) 26 Cal.3d 557, 562.) Substantial evidence is that "which is reasonable, credible, and of solid value." (*Id.* at p. 578.) Furthermore, if "the circumstances reasonably justify the [trier of fact's] findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

In finding defendant had not proven insanity by a preponderance, the trial court relied on defendant's testimony, the testimony of the two expert witnesses, these witnesses' curricula vitae and reports, defendant's interrogation by law enforcement, and the police reports. Based on a review of the entire record, substantial evidence supports the court's sanity finding.

Defendant testified about multiple stressors he had experienced in the year leading up to the offenses, including: His contracting work "just kind of dried up"; he fell behind on bills and child support payments; his contractor's license and driver's license were suspended; utilities in his home were turned off; his grandmother died; his girlfriend's grandmother died; his girlfriend's daughter was taken into protective custody because the

14

family was living in a home with no utilities; he was injured as a victim of an assault and battery; he accrued traffic tickets for driving with a suspended license; his house went into foreclosure; he had to give away his dog; and his family moved into the cramped quarters of his shop where the electricity was turned off at some point. When defendant was at his lowest, sitting alone in his shop with his gun in his mouth and voices in his head telling him to pull the trigger, he suddenly got a "really warm sensation" and thought "everything was going to be okay." Defendant "had this vision . . . that these government agencies, you know, with the DMV and child support and the banks and all these, these things out there were like this huge conspiracy just trying to destroy people's lives. And . . . it wasn't just happening to me. It was happening to everyone. . . . [¶] Everyone just seemed like they were losing their homes and their business, and I felt . . . like God was talking to me. I felt like I was being rescued. I was like plucked from the edge of suicide to . . . do something about it. . . . [¶] . . . [¶] I decided that I was gonna go to the bank and rob it. [¶] . . . ¶] This is what I'm supposed to do. God has given me a job, a purpose. [¶] . . . [¶] I felt like I needed to . . . be a superhero or Robin Hood, a hero to do something about it."

Defendant testified that at the time of the robbery, he did not believe he was doing anything wrong. On cross-examination, however, defendant acknowledged that he was able to distinguish right from wrong as to certain acts: Shooting an eyewitness would be wrong, shooting the bank clerks would be wrong, murder would be wrong, and hurting someone would be wrong. Defendant also indicated he knew that pointing a gun at people would be wrong (when asked if he pointed the gun at the people in order to scare them, defendant stated, "I never pointed the gun at them"), that scaring people would be wrong (stating that he did not want to scare anyone with the gun and that he would feel badly if they were scared), and that others would think his actions were wrong.

15

Dr. Mattiuzzi, the defense's expert witness, testified that at the time of the robbery, defendant suffered from severe depressive disorder, a major mental illness caused by his stressful life experiences and the incapacity to adapt and change. As to defendant's stressful experiences, listed previously, Dr. Mattiuzzi testified that "[t]hese are the types of stressors that drive people nuts. I mean it's significant episodes of serious life stress that would be difficult for most anyone to cope with and adjust to. [¶] . . . [¶] [I]t's very common for people who have stressors like this [*sic*] resulting in major depressive episodes resulting in psychotic level thinking to do erratic and impulsive behaviors trying to solve the situation." Dr. Mattiuzzi opined that at the time of the offenses, "[i]t appears quite probable . . . that . . . [defendant] *did not have the capacity* to know that his behavior was wrong."

On cross-examination, Dr. Mattiuzzi testified that if defendant had told people in the bank to remain calm and cooperate and no one would get hurt (defendant testified as much at trial), this would show that he knew he was scaring people. Dr. Mattiuzzi indicated that this, when coupled with defendant's statement that scaring people is wrong, could indicate that defendant knew that threatening people is wrong. Furthermore, as defendant did not want to shoot anyone and did not want anyone to get hurt, this indicates that he understood a moral component to murder during a bank robbery. This supports the conclusion that defendant had some ability to distinguish right from wrong at the time of the offenses.

Dr. Roof, the prosecution's expert witness, opined that defendant was capable of distinguishing right from wrong at the time of the offenses. Dr. Roof was unable to conclude that defendant was malingering—a point defendant emphasizes—but did express concern about the atypical presentation of the alleged delusions (defendant reported seeing color changes and face warping, which would generally happen over a

16

longer time period; defendant was vague about the voices he claimed to hear; he had no prior treatment).

Based on a review of the entire record in the light most favorable to the judgment, there is sufficient evidence for the trial court to have concluded that defendant was capable of distinguishing right from wrong at the time of the offenses, and therefore had not met his burden of proof as to sanity.

## DISPOSITION

The judgment is affirmed.


                                                      BUTZ            , J.

We concur:

      RAYE          , P. J.

      NICHOLSON     , J.