Filed 5/7/14  Chantry v. DMV CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| ALLEN EARL CHANTRY, | |
| Plaintiff and Respondent, | C070424 |
| v. | (Super. Ct. No. PC20110545) |
| DEPARTMENT OF MOTOR VEHICLES, | |
| Defendant and Appellant. | |

The Department of Motor Vehicles (DMV) suspended Allen Earl Chantry's driver's license following his arrest for driving a motor vehicle with 0.08 percent or more, by weight, of alcohol in his blood.  An administrative hearing officer upheld the suspension.

Chantry subsequently filed a petition for a writ of mandate in the trial court, seeking to set aside DMV's suspension order.  He argued that the hearing officer's finding that Chantry drove with a blood alcohol content (BAC) at or above 0.08 percent

1

was not supported by the evidence.  The trial court granted Chantry's writ petition and ordered DMV to set aside its suspension order, concluding that DMV did not present any evidence after Chantry rebutted the statutory presumptions in favor of DMV under the Vehicle Code and the Evidence Code.

DMV now contends that Chantry failed to show an irregularity in the administration of the chemical test and failed to overcome the Vehicle Code presumption that he was driving with a 0.08 BAC.

We conclude the statutory presumptions apply and substantial evidence does not support the trial court's finding that Chantry rebutted the Vehicle Code presumption.  We will reverse the judgment.

BACKGROUND

There is no dispute in this case about the propriety of considering the arresting officer's report in reviewing DMV's decision to suspend Chantry's driver's license and in the appeal of trial court's judgment.  (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 152-153; *Lake v. Reed* (1997) 16 Cal.4th 448, 462, 467-468.)  Accordingly, we draw the following facts from the arresting officer's sworn DS 367 statement and his unsworn investigation report.

At approximately 1:20 a.m. on June 19, 2011, a California Highway Patrol officer observed a red Chevrolet Corvette driving at a high rate of speed on Green Valley Road in El Dorado County.  The officer followed the car and, using radar, determined that the car was travelling at 71 miles per hour in a 55 mile per hour zone.  The officer stopped the Corvette.  Chantry was driving the car.

When the officer contacted Chantry through his driver's side window, he detected an odor of an alcoholic beverage coming from the car.  Chantry's eyes were watery.  The officer asked Chantry to step out of the car.  In talking with Chantry, the officer continued to smell alcohol on Chantry's breath and person.  Chantry said he was driving from the El Dorado Saloon to his home and admitted drinking three draft beers.  Chantry

said he had his first beer at 9:30 p.m. and drank his last beer at 12:20 a.m., one hour prior to the stop. Chantry reported that he last ate at 9:30 p.m. He ate what is described only as "Nutrisystem" in the investigation report. Chantry denied being a diabetic or epileptic, taking insulin, having any physical impairment, being under the care of a doctor, or having taken any medicine or drugs. Chantry's speech was normal.

The officer instructed Chantry to perform a series of field sobriety tests. Chantry poorly performed the tests as demonstrated. On the horizontal gaze nystagmus test,[1] Chantry displayed a lack of smooth pursuit in both eyes. The officer observed distinct and sustained nystagmus at the extremes and nystagmus prior to 45 degrees. On the Romberg test,[2] Chantry estimated 30 seconds in 25 seconds. On the one leg stand test, Chantry did not count as instructed, put his foot down at 13, 16 and 17, and moved two inches to the right from his center. On the walk and turn test,[3] Chantry stepped off the line during the instruction phase, then walked with four to five inches between each step on his first nine steps out, and walked with four to five inches between each step in 10 steps back. Based on his observations of Chantry's driving speed, symptoms of

---

[1] " 'Nystagmus is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotary. [Citation.] An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN. [Citation.] Some investigators believe alcohol intoxication increases the frequency and amplitude of HGN and causes HGN to occur at a smaller angle of deviation from the forward direction. [Citation.]' " (*People v. Leahy* (1994) 8 Cal.4th 587, 592.)

[2] In the Romberg test, the licensee is asked to stand at attention, close his eyes, tilt his head back, and estimate the passage of 30 seconds. (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 33.) While the licensee performs the test, the officer observes the licensee's balance and ability to accurately measure the passage of 30 seconds. (*Ibid.*)

[3] In the walk and turn test, the individual is asked to walk heel to toe in a straight line for nine steps, then turn around and walk back heel to toe. (See *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1303, fn. 3.)

intoxication, and field sobriety test performance, the officer believed Chantry was under the influence of alcohol.

The officer gave Chantry two preliminary alcohol screening (PAS) tests using an Alco-Sensor IV device. The first was given at 1:42 a.m. The second test was administered at 1:44 a.m. The officer recorded the result of the first test as 0.08 percent BAC and the result of the second test as 0.083 percent BAC.

Chantry was placed under arrest for driving under the influence of alcohol and submitted to postarrest breath tests. The tests were administered using an Alcotest 7410 Plus device. At 1:53 a.m., an "air blank" test was run, which registered a 0.000 result. Then the first breath test was administered at 1:54 a.m. A second breath test followed at 1:57 a.m. Both of the postarrest breath tests showed a result of 0.08 percent BAC.

Chantry was charged with violating Vehicle Code section 23152, subdivisions (a) and (b).[4] Section 23152, subdivision (a) makes it unlawful for a person who is under the influence of any alcoholic beverage to drive a vehicle. Section 23152, subdivision (b) makes it unlawful for a person to drive with a BAC of 0.08 percent or more.

In addition, the officer served Chantry with an administrative per se suspension order, informing Chantry that his driver's license would be suspended 30 days after June 19, 2011, and that he could request a hearing to challenge the suspension of his license. Chantry surrendered his driver's license to the officer.

Chantry subsequently requested an administrative hearing, which was held on August 22, 2011. At the hearing, Chantry argued that his BAC was below 0.08 percent when he was driving because his body was still absorbing the alcohol he had consumed. He presented the testimony of Jeffrey Zehnder, a forensic toxicologist. Zehnder opined it was more likely than not that Chantry had a BAC lower than 0.08 percent at the time of

---

[4] Undesignated statutory references are to the Vehicle Code.

4

the stop. Zehnder based his opinion on the officer's DS 367 statement, the investigation report, and the postarrest breath test results.

Zehnder opined that the results of the prearrest PAS test administered at 1:42 a.m. and the postarrest breath test administered at 1:54 a.m. were consistent with Chantry absorbing alcohol at 1:42 a.m. He said the normal absorption rate for a male subject was between 15 minutes to two hours, depending on whether there is food in the stomach, and if Chantry had last eaten at 9:30 p.m. and had consumed a beer one hour prior to the stop, he could be absorbing alcohol well beyond the time of the stop. Zehnder also said the fact that Chantry did not exhibit impairment in his driving, did not have unsteady gait or slurred speech, and estimated 30 seconds as 25 seconds indicated a BAC of less than 0.08 percent at the time of the stop. However, when questioned by the hearing officer, Zehnder conceded that Chantry's performance on the field sobriety tests provided grounds for the arresting officer to reasonably suspect Chantry drove while impaired.

Zehnder also testified that the Alco-Sensor IV device used to obtain the PAS test results was inaccurate. According to Zehnder, the margin of error on breath testing, even if done properly, was approximately 20 percent "because of the variables involved in breath testing and calibrating an instrument." Zehnder said that even if the arresting officer properly administered the breath tests, and even if the test instruments were accurately calibrated, it was more likely than not that Chantry's BAC was below 0.08 percent at the time of the stop.

The hearing officer received into evidence the arresting officer's DS 367 statement and investigation report and Chantry's postarrest breath test results. The hearing officer also received into evidence the PAS device accuracy check/calibration log. The hearing officer concluded that the arresting officer had reasonable cause to believe Chantry was driving in violation of section 23152, that Chantry was placed under lawful arrest, and that the preponderance of evidence showed Chantry drove a motor vehicle when he had a BAC of 0.08 percent or more.

The hearing officer found Zehnder credible and knowledgeable about forensic toxicology. He considered Zehnder's testimony that individual absorption rates varied based on a number of factors. But the hearing officer said Zehnder did not testify that he analyzed Chantry's alcohol absorption rate, and absent that analysis Zehnder's opinion that Chantry was still absorbing alcohol at the time of the stop was speculative. The hearing officer said it could be reasonably inferred from the stated drinking pattern, PAS test results (0.08 and 0.083 percent BAC) and postarrest breath test results (0.08 and 0.08 percent BAC) that Chantry "was fully absorbed" at the time of driving. The hearing officer concluded that Chantry drove with a BAC at or above 0.08 percent and suspended Chantry's driver's license.

Chantry filed a petition for writ of mandate in the trial court seeking judicial review of the hearing officer's decision. Chantry argued that he presented evidence -- the PAS device accuracy check/calibration log and Zehnder's expert testimony -- to rebut the presumption under section 23152, subdivision (b) that he had a BAC of 0.08 or greater when he was driving, thereby shifting the burden of producing evidence to DMV, and DMV failed to present substantial evidence justifying the suspension of his driver's license. The trial court agreed and granted the writ petition.

The trial court found that Chantry rebutted the presumptions in favor of DMV under section 23152 and Evidence Code section 664 by showing that Chantry's BAC was peaking some 25 minutes after the stop. In addition, the trial court said there was evidence that the PAS device, while within standards, was reading high before and after the stop. The trial court said that after Chantry rebutted the statutory presumptions, DMV failed to present any evidence showing that Chantry's BAC was 0.08 or higher at the time of driving. The trial court noted that if the officer had recorded the PAS results to more than two digits, there might have been evidence showing that Chantry's BAC was not rising, but such evidence was not in the record.

DISCUSSION

I

We begin with an overview of the statutory scheme under which Chantry's driver's license was suspended. DMV must immediately suspend the driver's license of a person who drives a motor vehicle with a BAC of 0.08 percent or greater. (§ 13353.2, subd. (a)(1).) The statutory procedure for such a suspension prior to a criminal conviction is called the " 'administrative per se' " law. (*Lake v. Reed, supra,* 16 Cal.4th at p. 454.) The licensee's driving privilege is suspended or revoked as an administrative matter, without imposing criminal penalties, upon a showing that the licensee was arrested for driving with a certain BAC and without additional evidence of impairment. (*Id*. at p. 454, fn. 1.) As the Supreme Court explained, "the administrative per se laws were deemed necessary due to the time lag that often occurs between an arrest and a conviction for driving while intoxicated or with a prohibited BAC. During this interim period, arrestees who could eventually be convicted of an intoxication-related driving offense were permitted to continue driving and, possibly, endangering the public thereby. Moreover, without administrative per se laws, persons with extremely high BAC levels at the time of arrest could escape license suspension or revocation by plea bargaining to lesser crimes or entering pretrial diversion. Thus, by providing for an administrative license suspension prior to the criminal proceeding, the law affords the public added protection." (*Id.* at pp. 454-455, fn. omitted.)

Under the administrative per se laws, the arresting officer or DMV must serve the licensee with a notice of the order of suspension. (§§ 13353.2, subds. (b) & (c), 13382, subd. (a).) The notice informs the licensee that his or her driver's license will be suspended 30 days from the date of service, states the reason and statutory grounds for the suspension, and explains the licensee's right to seek an administrative hearing on the suspension. (§§ 13353.2, subd. (c), 13353.3, subd. (a).) If the arresting officer serves the

7

notice, the officer also confiscates the person's driver's license and issues a 30-day temporary license. (§§ 13388, subd. (b), 23612, subd. (f).)

The licensee may request an administrative hearing on the merits of the suspension. (§ 13558.) In order to sustain an order of suspension, DMV must prove by a preponderance of the evidence that (1) the peace officer had reasonable cause to believe that the licensee had been driving a motor vehicle with a BAC of 0.08 percent or more; (2) the licensee was placed under arrest; and (3) the licensee was driving a motor vehicle when he or she had 0.08 percent or greater BAC. (§§ 13557, subd. (b)(3), 13558, subd. (c)(2); *Lake v. Reed, supra,* 16 Cal.4th at pp. 455, 463; *Santos v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 537, 549 (*Santos*).) The determination of the facts at the administrative proceeding is a civil matter that is independent of the determination of the licensee's guilt or innocence and does not have collateral estoppel effect on a subsequent criminal prosecution. (§§ 13353.2, subd. (e), 13557, subd. (f).)

DMV may satisfy its burden of proof with the presumption set forth in Evidence Code section 664 that official duty has been regularly performed. (*Brenner v. Department of Motor Vehicles* (2010) 189 Cal.App.4th 365, 370 (*Brenner*); *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1232-1233 (*Manriquez*).) Law enforcement officers have an official duty to perform blood-alcohol analyses by methods devised to assure reliability and to accurately report the facts of an arrest for drunk driving. (*Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 141, 143 (*Davenport*).) Sections 1215 et seq. of title 17 of the California Code of Regulations contain the standards for breath alcohol analysis, including the collection and testing of samples, for instrument performance, and for approved instruments. (*Davenport, supra,* at p. 142.) Compliance with those standards gives rise to an inference that the blood alcohol test results are trustworthy, establishing a foundation for the admission of test results and a basis for finding that such results are legally sufficient to support requisite findings in an administrative per se proceeding. (*Davenport, supra,* 6 Cal.App.4th at

pp. 141-144; *McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 525 (*McKinney*).) DMV is not required to present additional foundational evidence at that point. Rather, the driver must produce affirmative evidence of the nonexistence of the presumed facts sufficient to shift the burden of proof back to DMV. (*Brenner, supra,* 189 Cal.App.4th at p. 370; *Manriquez, supra,* 105 Cal.App.4th at p. 1233.) " ' "The licensee must show, 'through cross-examination of the officer or by the introduction of affirmative evidence, that official standards were in any respect not observed . . . .' [Citation.] Once such showing has been made, the burden shifts to the DMV to prove that the test was reliable despite the violation." ' " (*Brenner, supra,* 189 Cal.App.4th at p. 370; *Manriquez, supra,* 105 Cal.App.4th at p. 1233.)

A trial court may review DMV's determination sustaining a suspension. (§ 13559, subd. (a).) Such review is limited to the record of the administrative hearing. (*Ibid*.) If the trial court finds that DMV exceeded its constitutional or statutory authority, made an erroneous interpretation of the law, acted in an arbitrary and capricious manner, or made a determination which is not supported by the evidence in the record, the trial court may order DMV to rescind the order of suspension. (*Ibid*.)

"In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court is required to determine, based on its independent judgment, ' "whether the weight of the evidence supported the administrative decision." ' " (*Lake v. Reed, supra,* 16 Cal.4th at pp. 456-457.) The trial court must afford the administrative findings a strong presumption of correctness. (*Brenner, supra,* 189 Cal.App.4th at p. 370.) The licensee bears the burden of showing that the administrative findings are contrary to the weight of the evidence. (*Ibid.*)

On appeal, we review the record to determine whether the trial court's findings are supported by substantial evidence. (*Lake v. Reed, supra,* 16 Cal.4th at pp. 456-457.) We resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. (*Ibid.*) Where the evidence supports more than one

9

inference, we do not substitute our judgment for the trial court's. (*Ibid.*) We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings. (*Ibid.*) But a challenge to the general reliability of an approved breath testing device is a challenge to the regulation allowing the device to be on the approved list and is addressed to our independent judgment. (*Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1121 (*Borger*).)

## II

Although the trial court said there was evidence the PAS device, while within standards, was reading high before and after the stop, the Attorney General contends Chantry failed to overcome the Evidence Code section 664 presumption with regard to the PAS test results because he did not demonstrate an irregularity in the administration of the PAS test, in the Alco-Sensor IV device the officer used to conduct the PAS test, or in the recording of the PAS test results. Chantry does not claim that the arresting officer improperly administered the alcohol breath tests or inaccurately recorded the test results; he contends instead that the breath test results were inaccurate.

A licensee may rebut the presumptive correctness of a blood alcohol test result by presenting evidence that the instrument used to measure his blood alcohol level produced results higher than the accurate values. (*Brenner, supra,* 189 Cal.App.4th at p. 371.) Here, the PAS device accuracy check/calibration log and Zehnder's testimony showed that the Alco-Sensor IV device used to obtain Chantry's PAS test results, while within acceptable limits, was reading high on June 15 (0.101 and 0.106 instead of 0.100) and June 24 (0.102 and 0.102 instead of 0.100), days before and after Chantry's arrest.[5]

---

[5] Section 1221.4, subdivision (a)(2)(A) of title 17 of the California Code of Regulations provides that the accuracy of instruments used for breath alcohol analysis must be determined, at a minimum, through periodic analysis of a reference sample of known

Thus, substantial evidence supports the trial court's finding that the device used to conduct Chantry's PAS tests was reading high.

Nonetheless, the Attorney General claims Chantry did not rebut the Evidence Code section 664 presumption regarding the postarrest breath test results.

We independently review the issue of the general reliability of the Alcotest 7410 Plus device used to administer the postarrest breath tests. (*Borger, supra,* 192 Cal.App.4th at p. 1121.) While there was evidence that the Alco-Sensor IV device used to obtain the PAS test results was reading high, there was no evidence that the Alcotest 7410 Plus device used to administer the postarrest breath tests was inaccurate. Alcotest 7410 Plus was a state approved breath alcohol analysis instrument. (Cal. Code Regs., tit. 17, § 1221.3; Highway Safety Programs; Conforming Products List of Evidential Breath Alcohol Measurement Devices, 75 Fed.Reg. 11624 (Mar. 11, 2010).) The test results obtained using that device showed that Chantry had the proscribed BAC level of 0.08 percent at 1:54 a.m. and 1:57 a.m.

*Borger, supra,* 192 Cal.App.4th 1118, which involved margin of error expert testimony similar to that presented in this case, is instructive. The expert in *Borger* testified that all "Intoxilyzer 5000" machines had an inherent margin-of-error of plus or minus 0.02 percent. (*Id.* at pp. 1120-1121.) He said the licensee's BAC could be " 'anywhere between a 0.06 and a 0.10' " and he could not say with reasonable scientific certainty that the licensee's BAC was 0.08 percent or higher. (*Ibid.*) The trial court credited the expert's testimony and granted the licensee's request to set aside DMV's suspension of his driver's license. (*Ibid.*) However, the appellate court held that the expert's testimony failed to rebut the presumptive validity of the breath test results. (*Id.* at pp. 1122-1123.) It noted that the device in that case was a state approved testing

alcohol concentration within accuracy and precision limits of plus or minus 0.01 grams percent of the true value.

instrument, and the expert did not examine the machine used to test the licensee's breath and offered no opinion about whether that particular machine was in working order. (*Id.* at p. 1122.)  Further, the expert offered no reasoning to support his margin of error opinion.  (*Ibid.*)  He did not present any scientific tests with regard to the Intoxilyzer 5000 or other expert opinion supporting his conclusion.  (*Ibid.*)  The appellate court ruled that the expert's testimony did not show that " 'official standards' " were not observed, and hence DMV did not have to prove that the test was reliable.  (*Ibid.*)  Thus, the trial court erred in crediting the expert's margin of error testimony.  (*Id.* at p. 1123.)

In this case, the arresting officer's DS 367 statement verified that the postarrest breath test results were obtained in the regular course of the officer's duties, the officer was qualified to operate the equipment, and the test was administered pursuant to title 17 of the California Code of Regulations.  That evidence gave rise to the Evidence Code section 664 presumption and an inference that the 0.08 percent BAC test results obtained using the Alcotest 7410 Plus device were reliable.  (*Robertson v. Zolin* (1996) 44 Cal.App.4th 147, 151; *Davenport, supra*, 6 Cal.App.4th at pp. 141-143.)

Although Zehnder opined that breath testing in general had a margin of error of 20 percent "because of the variables involved in breath testing and calibrating an instrument," he did not identify the variables involved in breath testing and calibrating an instrument, and he did not explain how any such variables resulted in a 20 percent margin of error in Alcotest 7410 Plus devices.  Like the expert in *Borger*, Zehnder also did not testify that he examined the Alcotest 7410 Plus device used in this case and that the device was inaccurate.  Zehnder's unsupported conclusion is not substantial evidence. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 762 [opinion was conclusory and speculative where the expert did not state any facts to support his opinions and he never saw or inspected the escalator at issue in the case]; *Borger*, *supra*, 192 Cal.App.4th at p. 1122.)

12

The trial court concluded that "the presumption was rebutted in this case," but it did not identify any evidence which rebutted the presumed reliability of the postarrest breath test results. Because Zehnder's testimony did not refute the inference under Evidence Code section 664 that the postarrest breath test results were reliable, the trial court erred in concluding that Chantry rebutted the presumed reliability of those test results.

*Brenner* is distinguishable because in that case the expert's testimony concerning the inaccurate readings of the breath test device that had been used was supported by maintenance records for the device. (*Brenner, supra,* 189 Cal.App.4th at p. 368.)

III

In addition, although the trial court found that Chantry rebutted the presumptions in favor of DMV under section 23152 and Evidence Code section 664 by showing that Chantry's BAC was peaking at 1:44 a.m., the Attorney General claims Chantry did not rebut the presumption that his BAC was at least 0.08 percent at the time of driving.

When a chemical test performed within three hours of driving shows a BAC of 0.08 percent or greater, there is a rebuttable presumption that the licensee had a 0.08 percent or more BAC at the time of driving. (§ 23152, subd. (b).) This presumption applies in administrative per se proceedings. (*Corrigan v. Zolin* (1996) 47 Cal.App.4th 230, 236; *Jackson v. Department of Motor Vehicles* (1994) 22 Cal.App.4th 730, 740, fn. 9; *Bell v. Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 312 (*Bell*).)

The appellate court in *Bell* explained the legislative intent behind the section 23152, subdivision (b) presumption: "[I]n enacting the presumption, the Legislature intended (1) to 'diminish the arguments that ha[d] arisen when extrapolating the [BAC] at the time of the test back to the time of the driving' [citation], (2) 'to close a potential loophole in the current law, whereby a person . . . could claim that he or she had consumed . . . alcohol which had not yet been absorbed into the bloodstream while the person was operating the vehicle, but which later raised the blood alcohol level'

13

[citation], and (3) 'to recognize that alcohol concentrations dissipate over time, so that a person whose blood alcohol levels exceed the permissible concentrations at the time of the test, was likely to have had unlawfully high blood alcohol levels when driving' [citation]." (*Bell, supra*, 11 Cal.App.4th at p. 311.)

The arresting officer's DS 367 statement and investigation report showed that the postarrest breath tests were administered within 40 minutes after the officer stopped Chantry's car. Those tests yielded results of 0.08 percent BAC. That evidence created a presumption that Chantry's BAC was 0.08 percent or more at the time of driving, subject to a contrary showing by Chantry. (§ 23152, subd. (b).) As we have explained, under Evidence Code section 664 the postarrest breath test results were presumptively reliable.

To rebut the section 23152, subdivision (b) presumption, Chantry presented Zehnder's expert opinion that the results from the PAS test taken at 1:42 a.m. and the postarrest breath test taken at 1:54 a.m. were consistent with Chantry still absorbing alcohol at 1:42 a.m. Zehnder said if Chantry had last eaten at 9:30 p.m. and had consumed a beer one hour prior to the stop, he could be absorbing alcohol well beyond the time of the stop. The hearing officer did not exclude Zehnder's testimony.

However, Zehnder's opinion was insufficient to show that Chantry's blood alcohol level was still rising. The rate of alcohol absorption depends on many variables, including the amount of food in the stomach, the amount of alcohol consumed, the time over which it was consumed, and numerous individual factors. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1191, fn. 5.) Nonetheless, Zehnder did not discuss how the various factors specific to Chantry on the evening of his arrest contributed to Zehnder's ultimate conclusion that Chantry was still absorbing alcohol at 1:42 a.m. -- factors such as the "Nutrisystem" and the beer Chantry consumed at 9:30 p.m., the second beer he consumed sometime between 9:30 p.m. and 12:20 a.m., or Chantry's body weight. Expert opinion

14

must have evidentiary support.[6] (*Borger, supra*, 192 Cal.App.4th at pp. 1121-1122.) As the hearing officer found, Zehnder's opinion that Chantry's BAC level was rising at the time of the stop lacked reasoned analysis. It was error for the trial court to accept Zehnder's opinion without the requisite evidentiary support. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [courts have the obligation to require adequate foundation for expert opinion].)

In addition, Zehnder's rising BAC opinion may have been based on a misunderstanding about the PAS test results. Zehnder testified that Chantry registered a 0.083 and 0.081 percent on the PAS tests. But the arresting officer's investigation report showed the PAS test results were 0.08 and 0.083 percent.

---

[6] The appellate court in *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113 (*Pacific Gas & Electric Co.*) said the value of expert opinion rests not in the conclusion reached but in the factors considered and the reasoning employed. (*Pacific Gas & Electric Co., supra,* 189 Cal.App.3d at p. 1135; see also *People v. Coogler* (1969) 71 Cal.2d 153, 166 [" ' "The chief value of an expert's testimony . . . rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion . . . ." ' " (Italics omitted.)].) Where an expert bases his conclusion on assumptions which are not supported by the record or on factors which are speculative, the expert's conclusion has no evidentiary value. (*Pacific Gas & Electric Co., supra,* 189 Cal.App.3d at p. 1135.) "In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.] When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence. [Citations.]" (*Id.* at pp. 1135-1136.) Citing *People v. Eubanks* (2011) 53 Cal.4th 110, Chantry contends *Pacific Gas & Electric Co.* does not apply to medical expert opinion. However, the Supreme Court in *People v. Eubanks* said, consistent with *Pacific Gas & Electric Co.,* that medical opinion testimony is admissible if the expert disclosed the basis of her opinion and her opinion was founded on information upon which an expert may reasonably rely. (*People v. Eubanks, supra*, at p. 142; see also *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [medical expert's opinion has no evidentiary value when it is conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion]; *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 [same].)

Even if Zehnder misspoke when he described the PAS test results, his conclusion that Chantry's BAC was rising at 1:42 a.m. was speculative because the results for the tests administered at 1:42 a.m. (0.08), 1:54 a.m. (0.08) and 1:57 a.m. (0.08) contained only two decimal place numbers and Zehnder did not testify about Chantry's individual absorption of alcohol. No reasonable inference or conclusion can be made about whether Chantry's blood alcohol level was rising based on the test results because the numbers in the third decimal place for all of the test results are not known. Speculative matters are not a proper basis for an expert's opinion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; *People v. Thompson* (2006) 38 Cal.4th 811, 826 [recognizing that expert testimony about the defendant's blood-alcohol level at an earlier point " 'by extrapolating backward from the later-taken results' " can be speculative and that numerous variables such as weight, time and content of the last meal, and physical exertion may affect the rate at which alcohol dissipates].)

Zehnder also said the fact that Chantry did not exhibit impairment in his driving, did not have unsteady gait or slurred speech, and estimated 30 seconds as 25 seconds in the Romberg test was consistent with his opinion that Chantry had a BAC of less than 0.08 percent at the time of driving. However, Zehnder conceded, based on Chantry's performance on the field sobriety tests, that the arresting officer was justified in arresting Chantry for driving under the influence. Chantry did not present other evidence to rebut the section 23152, subdivision (b) presumption.

DMV was required to prove by a preponderance of the evidence that Chantry drove when he had a BAC of 0.08 percent or more. The presumptively accurate postarrest breath test results showed that Chantry had a 0.08 percent BAC. (Evid. Code, § 664.) No evidence in the record showed the postarrest breath tests were inaccurate. Additionally, under section 23152, subdivision (b), there was a rebuttable presumption that Chantry had a BAC of at least 0.08 percent at the time of driving because the arresting officer administered the alcohol breath tests within three hours of driving and

16

those tests showed a BAC of 0.08 percent. Zehnder's testimony did not rebut the section 23152, subdivision (b) presumption. Therefore, DMV was not required to present additional evidence. (*Wilson v. Zolin* (1992) 9 Cal.App.4th 1104, 1108 [DMV need not present foundational evidence establishing the trustworthiness of the chemical test result unless the licensee overcomes the initial statutory presumption]; *Santos, supra*, 5 Cal.App.4th at p. 549 [DMV had to rebut the licensee's evidence after the licensee showed that DMV could not prove her BAC at the time of driving without knowing the time her blood sample was drawn].)

Circumstantial evidence corroborated the presumption that Chantry had the proscribed level of blood alcohol at the time of driving. (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 266, fn. 10 ["Circumstantial evidence will generally be necessary to establish the requisite blood-alcohol level called for by the statute."]; *Jackson v. Department of Motor Vehicles, supra,* 22 Cal.App.4th at pp. 740-741 [the hearing officer could draw inferences and deductions of fact from the facts presented]; *McKinney, supra,* 5 Cal.App.4th at p. 526, fn. 6 [circumstantial evidence can support finding whether the licensee had the proscribed blood alcohol level while driving].) " 'Evidence regarding the manner in which a defendant drove, performed field sobriety tests, and behaved is . . . relevant as tending to establish that he did or did not have a . . . [0.08 percent BAC] while driving.' [Citation.]" (*McKinney, supra*, 5 Cal.App.4th at p. 526, fn. 6, italics omitted.) Here, the arresting officer smelled alcohol on Chantry's person and breath and saw that Chantry had watery eyes. Chantry admitted drinking three draft beers and that he drank the third beer one hour before he was stopped. He poorly performed the field sobriety tests as demonstrated.

Chantry asserts that *Santos, supra,* 5 Cal.App.4th 537, is similar to the present case, but in that case it was not clear when the licensee's blood test, showing a BAC of 0.13 percent, was conducted. (*Santos, supra,* 5 Cal.App.4th at pp. 542, 548.) A forensic toxicologist had testified that the blood alcohol level rises for a period of time after

17

alcohol is consumed, so blood drawn shortly after consumption should show a lower blood alcohol level than blood drawn when the alcohol reaches its maximum level. (*Id.* at p. 548.) According to the expert, without knowing the time blood was drawn there would be no way to determine what the licensee's BAC was when she was driving. (*Id.* at p. 543.) The appellate court held DMV could not prove that the licensee's BAC at the time of driving was 0.08 percent or higher without evidence about when her blood sample was taken. (*Id.* at p. 550.) And without evidence of when the licensee's blood was drawn, there was no basis for applying the section 23152, subdivision (b) presumption. (*Id.* at pp. 549-550 & fn. 8.)

Here, unlike in *Santos*, the test times are known, and can be considered in light of when Chantry ate and drank alcohol. Chantry had his first beer approximately 3 hours and 50 minutes before he was stopped and his last drink one hour before he was stopped. The postarrest breath tests were administered about one and a half hours after Chantry had his last beer. In addition, the record in *Santos* included details of the heavy meal and large amount of water that the licensee consumed before she was stopped (*Santos, supra*, 5 Cal.App.4th at p. 543), but here the record only described the meal Chantry ate as "Nutrisystem" and did not indicate how much he ate or whether he consumed any nonalcoholic beverage after he began drinking beer. In addition, although the expert witness in *Santos* provided an opinion based on the licensee's weight and the amount and times of alcohol and food consumption, Zehnder did not provide reasoned analysis for his opinion about rising BAC. *Santos* is distinguishable.

The statutory presumptions, along with the arresting officer's observations, Chantry's admissions, and the postarrest breath test results, support the hearing officer's conclusion that Chantry's BAC was 0.08 percent or greater at the time of driving. (*Lake v. Reed, supra,* 16 Cal.4th at pp. 452-453, 468 [substantial evidence supports finding that licensee was driving with more than 0.08 percent blood alcohol concentration where the officer observed objective manifestations of intoxication and a urine test showed the

18

licensee had 0.19 percent BAC].)  Zehnder's testimony was insufficient to rebut the presumption that DMV's evidence was reliable and that Chantry had the proscribed BAC at the time of driving.  The trial court's contrary finding is not supported by substantial evidence.

## DISPOSITION

The trial court order directing DMV to vacate its order suspending Chantry's driver's license and requiring DMV to return Chantry's driver's license is reversed.  The trial court is directed to enter a judgment denying Chantry's petition for writ of mandate and reinstating DMV's suspension order.  DMV shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

            MAURO       , J.

We concur:

       RAYE      , P. J.

      MURRAY    , J.

19